IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

DEMERIS TOLBERT,

                                        Plaintiff,                    Civil Action No.
                                                                      9:13-CV-1577 (LEK/DEP)

        v.

CARL J. KOENIGSMANN, *et al.*,

                                        Defendants.

_____

APPEARANCES:                                              OF COUNSEL:

FOR PLAINTIFF:

DEMERIS TOLBERT, *Pro Se*
01-A-2883
Attica Correctional Facility
Box 149
Attica, NY 14011

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN                 MELISSA A. LATINO, ESQ.
New York State Attorney General           Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

*Pro se* plaintiff Demeris Tolbert, a New York State prison inmate, has commenced this civil rights action, pursuant to 42 U.S.C. § 1983, against various medical employees stationed at the prison facility in which he was confined at the relevant times. In his complaint, plaintiff alleges that those defendants violated his Eighth Amendment rights by ignoring his serious medical needs, and his First Amendment rights by retaliating against him.

Defendants have moved for the entry of summary judgment dismissing plaintiff's complaint in its entirety, arguing that plaintiff received constitutionally adequate and appropriate medical care while confined, and that he cannot establish a causal connection between the protected conduct and adverse action alleged in support of his retaliation claim.[1] Plaintiff opposes that motion, asserting the existence of genuine, triable issues of fact precluding summary dismissal of his claims. Because I find that no reasonable factfinder could conclude that defendants were deliberately indifferent to plaintiff's serious medical needs, or that he was

---

[1]    Defendants also raise arguments relating to Eleventh Amendment immunity and qualified immunity. Dkt. No. 144-14 at 6-7, 24-25. In light of my recommendations on the merits of plaintiff's claims, I have elected not to address these alternative arguments.

retaliated against for complaining of their alleged indifference, I recommend that defendants' motion be granted in its entirety.

I.    BACKGROUND[2]

Plaintiff is a New York State prison inmate currently being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally* [Dkt. No. 1](). Although he is currently incarcerated in the Attica Correctional Facility, located in Attica, New York, at the times relevant to his claims, he was confined in the Upstate Correctional Facility ("UCF"), located in Malone, New York. *Id.*

Plaintiff's medical records reflect that he has several conditions, and is seen often by prison medical staff.[3] *See generally* [Dkt. No. 145](). His complaints range from, among other problems, constipation, [Dkt. No. 145-1 at 65](), high cholesterol, *id.* at 73, and acne, *id.* at 25. The primary conditions at issue in this case stem from medical care that he received in

---

[2]    The following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in the non-movant's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

[3]    This is not the first action brought by plaintiff against prison officials claiming deliberate indifference to his medical needs. On August 12, 2002, plaintiff commenced an action against several DOCCS employees, claiming that while incarcerated in the Great Meadow Correctional Facility, he received inadequate medical care and treatment, and in addition was retaliated against for having raised complaints concerning the alleged inadequacy of his medical treatment, including through the grievance process. *Tolbert v. Nesmith, et al.*, No. 9:02-CV-1042 (N.D.N.Y., filed 2002). Plaintiff's claims in that action were ultimately dismissed on motion for summary judgment. *Id.*, Dkt. Nos. 34, 35.

connection with a 25-year-old gunshot wound to his left lower extremity, as well as a skin condition. Dkt. No. 91-1 at 1-3, 6-7; Dkt. No. 144-7 at 3; Dkt. No. 145-1 at 5, 7, 58; Dkt. No. 149-2 at 185.

A.    Sick Call and Medication Protocols at the UCF

"Sick call" is the DOCCS system by which an inmate may request and receive medical care for non-urgent, self-reported illnesses or injuries.[4] Dkt. No. 144-8 at 8; Dkt. No. 144-13 at 3; *see generally* Dkt. No. 144-10. Each individual prison facility is responsible for creating its own sick call procedures. Dkt. No. 144-8 at 8-9. Upon intake at a particular facility, such as the UCF, an inmate will receive medical orientation, which outlines how that facility handles the sick call procedure. Dkt. No. 144-8 at 8-9; Dkt. No. 144-10 at 2-3; Dkt. No. 144-13 at 3-4.

In order to be seen by a medical provider, inmates at the UCF must "have their [cell] lights on, be clothed, and be standing at their door ready to discuss their medical concerns."[5] Dkt. No. 144-13 at 4. In addition, inmates are required to be "cooperative with the [n]urse" and not "act in

---

[4]    DOCCS facilities also offer 24-hour emergency medical care. Dkt. No. 144-8 at 8; Dkt. No. 144-10 at 2.

[5]    Somewhat inexplicably, plaintiff contends that "inmates are not told that they would be denied sick call . . . if they are not prepared for sick call rounds," yet agrees that during the relevant times, "inmates were required to be prepared for their sick call visits." *Compare* Dkt. No. 144-2 at 4, 6 *with* Dkt. No. 149 at 12, 18.

any manner to interfere with sick call rounds." *Id.* If an inmate fails to follow the required protocol, he is considered as having "refused the sick call[.]" *Id.* If an inmate refuses sick call one day, he is still permitted to request sick call on the following day. *Id.* Moreover, if an inmate is in immediate distress, he can request emergency medical care. Dkt. *Id.*

The UCF also has in place certain processes for the administration of medication to its inmate population, which defendants refer to as "med rounds." Dkt. No. 144-13 at 5. During the relevant time period, the UCF distributed medications to inmates three times per day. *Id.* Much like sick rounds, in order to receive medication, an inmate is required to be appropriately dressed, have the cell lights on, and behave cooperatively. *Id.* at 4-6. In addition, the inmate is required to provide his name and inmate number, in order to enable the nurse to verify that the inmate was receiving the correct medication and dosage. *Id.* at 4.

The UCF also utilizes "one-to-one" medication administration. Dkt. No. 144-13 at 6. Under this protocol, once an inmate is provided with medication, he "must open his mouth, show the total number pills provided, swallow the medication, and show . . . his mouth and under his tongue after consumption." *Id.* If an inmate refuses to comply with this protocol, the nurse must issue an inmate misbehavior report. *Id.* An

inmate's repeated refusal to comply will result in a "crush and dissolve order," whereby medication is provided to the inmate in liquid form. *Id.*

If an inmate fails to follow the protocol for med rounds, he is considered as having refused his medication. Dkt. No. 144-13 at 6. Although he will still be offered his next scheduled dosage (unless it is contradicted), the matter is referred to a physician for review following at least three medication refusals. *Id.* at 6-8.

The medical records submitted by the parties reveal that plaintiff has a significant history of refusing or failing to comply with the sick call procedures. *See generally* Dkt. No. 145. In addition, those medical records indicate that he has frequently refused his medication. *See generally id.*

B.    Plaintiff's Medical Treatment at the UCF

In June 2011,[6] plaintiff was transferred into the UCF, at which time he was placed directly into a special housing unit ("SHU") cell.[7] Dkt. No. 144-7 at 3. During the time that he was incarcerated at the UCF, plaintiff

---

[6]    Plaintiff was transferred out of the Southport Correctional Facility in April 2011, Dkt. No. 145-1 at 56, at which point he was transferred to Five Points Correctional Facility where he remained for several weeks, *id.* at 57. Plaintiff was received at the UCF on June 3, 2011. *Id.* at 60; *see also* Dkt. No. 145-2 at 24-27.

[7]    **Error! Main Document Only.**Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined for twenty-three hours each day, primarily for disciplinary reasons. *Samuels v. Selsky*, No. 01-CV-8235, 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002).

was seen by, and received a variety of treatment and medication from, various prison medical personnel. *See generally* Dkt. No. 145. Because plaintiff generally makes discrete allegations against the named defendants, I will outline those allegations as they pertain to each defendant.

### 1.    Defendant Renee Holmes

Defendant Renee Holmes ("Nurse Holmes"), a registered nurse, was responsible for conducting both sick call and med rounds at the UCF, and, in that capacity, she had frequent interactions with plaintiff. Dkt. No. 144-13 at 1-2. During their first interaction, on June 9, 2011, Nurse Holmes documented that plaintiff was "angry," "belligerent," and threatening." Dkt. No. 145-1 at 61. Nonetheless, plaintiff makes far-reaching complaints regarding the medical treatment that he received from Nurse Holmes, alleging that she (1) failed to discretely and quietly discuss plaintiff's medical issues; (2) changed his medication schedule from morning and afternoon to morning and evenings; (3) provided him with liquid medication even though it caused him "dizziness and stomach pains"; (4) threatened to issue him an inmate misbehavior report and cease all medications if plaintiff refused to take his medication; and (5) was generally "mean" to

plaintiff and denied him medical attention.[8] Dkt. No. 91 at 23-27. Plaintiff also alleges that because he complained regarding the liquid medication to another medical provider, Nurse Holmes retaliated against him by issuing a false inmate misbehavior report in August 2011. Dkt. No. 91 at 24-25.

Plaintiff's medical records reveal that plaintiff was on a "crush and dissolve order" as early as June 4, 2011. Dkt. No. 145-1 at 60; *see also id.* at 61 (indicating that plaintiff "drinks [the] rest" of his medication); Dkt. No. 145-3 at 13-15 (documenting plaintiff's refusal of crushed and dissolved medication). On June 17, 2011, the crush and dissolve order was discontinued, but one-to-one medication administration was continued. Dkt. No. 145-1 at 62; Dkt. No. 145-2 at 49. On July 12, 2011, however, plaintiff complained to Nurse Holmes that "[the] other nurse gave [him crushed and] dissolved meds." Dkt. No. 145-1 at 64. In response, Nurse Holmes advised plaintiff that it was "not [her] responsibility" and that he should address the issue at the time it occurred. *Id.*

---

[8]    Although plaintiff's amended complaint is not notarized, in light of his *pro se* status, I have considered it as the legal equivalent of an affidavit for purposes of the pending summary judgment motion. 28 U.S.C. § 1746 (1994); Fed. R. Civ. P. 56(e); *Franco*, 854 F.2d at 587; *see also BMS Entm't/Heat Music LLC v. Bridges*, No. 04 Civ. 2584, 2005 WL 2482493, at *2 n.1 (S.D.N.Y. Oct. 7, 2005) (accepting as a declaration under 28 U.S.C. § 1746 an affidavit that was not notarized but "certified" that "each of the statements contained herein is true to the best of my information and belief" and contained a "penalty of perjury" clause).

On August 3, 2011, Nurse Holmes documented the following in

plaintiff's medical chart:

> Sick call addressed, 1:1 meds given. Non-
> compliant. Inmate shows 3 round pills on tongue.
> Inmate on Baclofen, Ultram (has oblong pills +
> Neurontin). Asked [the inmate] where [is] the med[?]
> States, "oh, I swallowed it." After 3 round[] pills
> swallowed asked if he's going to show me the other
> medicine, continues to argue. Advised provider will
> be made aware. [Misbehavior report] submitted.
> Note on 6/17/11 [indicates that the c]rush and
> dissolve orders were [discharged].

Dkt. No. 145-1 at 67. A Tier II disciplinary hearing was conducted to

address the misbehavior report issued by Nurse Holmes in August 2011.[9]

Dkt. No. 91-1 at 25. Following that hearing, plaintiff was found not guilty of

unauthorized medication,[10] but guilty of refusing a direct order. *Id.*

On August 4, 2011, plaintiff's chart was reviewed, and he was placed

back on a crush and dissolve order by defendant Glenn Schroyer. *Id.* at

---

[9]     The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace*, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes*, 143 F.3d at 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

[10]     According to the regulations that govern standards for inmate behavior, "[a]n inmate shall not possess outdated or unauthorized types or quantities of medication, nor shall an inmate sell, exchange or provide any medication to anyone." 7 NYCRR § 270.2.

68. On August 6, 2011, plaintiff refused all crushed and dissolved meds.

*Id.* at 69; Dkt. No. 145-3 at 10.

Thereafter, on August 10, 2011, the following note was entered by

Nurse Holmes in plaintiff's medical chart:

> AM med rounds: [two] ointments, Ultram, baclofen,
> and Neurontin. Gives DIN wrong – asked to state
> again. Gives DIN quickly, smiling[,] and wrong.
> Advised will be considered refusal (x4 wrong DIN
> given). Med disposed – witnessed by CO – CO told
> [plaintiff] that is not your DIN. Manipulative. Noted
> inmate has refused AM meds four other times this
> week.

Dkt. No. 145-1 at 70; *see also* Dkt. No, 145-3 at 8.

The following day, a nurse practitioner reviewed plaintiff's chart and

noted that plaintiff had refused Ultram on seven previous occasions. Dkt.

No. 145-1 at 70. As a result, his dosage was reduced and his crush and

dissolve order was continued. *Id.*

### 2. Defendant William Parmer

Defendant William Parmer ("N.P. Parmer"), a certified nurse

practitioner, was employed by the DOCCS from 1999 until May 2012. Dkt.

No. 144-11 at 1. In that position, he was responsible for the examination

and treatment of inmates, including plaintiff, for their various medical

conditions. *Id.* at 2.

N.P. Parmer evaluated plaintiff on June 17, 2011, shortly after his

10

arrival at the UCF. Dkt. No. 145-1 at 62. At that time, N.P. Parmer discontinued plaintiff's crush and dissolve order, but continued the one-to-one medication administration. *Id.* During that visit, plaintiff expressed that he wanted to continue his prior treatment regime for his skin condition, which according to plaintiff, included one topical cream for his genitals, one topical cream for his head, one topical cream for his feet and hands, a medicated soap, and lotion.[11] Dkt. No. 91 at 9; *see* Dkt. No. 91-1 at 2. In response to plaintiff's request, N.P. Parmer instead prescribed two topical creams—Clobetasol, a corticosteroid to reduce itching and redness, and Eucerin, to reduce dryness. Dkt. No. 144-11 at 3; Dkt. No. 145-1 at 62, 65, 66-84. N.P. Parmer also permitted plaintiff to have access to Neutrogena soap. Dkt. No. 144-11 at 3; Dkt. No. 145-1 at 65, 75.

### 3.    Defendant Richard Adams

Defendant Richard Adams ("Dr. Adams"), a physician, has been employed by DOCCS since October 2007. Dkt. No. 144-12 at 3. Although Dr. Adams is assigned to the Clinton Correctional Facility, he occasionally

---

[11]    Plaintiff's medical records indicate that prior to his transfer to the UCF, he received various combinations of, *inter alia*, Valisone, Lidex, Clobetasol, Carmol, Dovonex, calcipotriene cream, flurandrenolide tape, and Cetaphil soap to treat complaints related to his skin condition. *See, e.g.* Dkt. No. 145-1 at 6-8, 11, 18, 20, 28, 30, 38, 43. Plaintiff acknowledged during his deposition that due to funding issues, alternative medications can and are provided to inmates at times. Dkt. No. 144-4 at 29-30.

provides medical services to inmates at the UCF. *Id.* According to plaintiff, when he was examined in October 2012, Dr. Adams refused to provide him a prescription for pain medicine, skin cream, soap, or refer him to a dermatologist. Dkt. No. 91 at 15-18; *see also* Dkt. No. 144-12 at 2; Dkt. No. 145-1 at 103.

Contemporaneous medical records for the October 1, 2012 examination reveal that plaintiff was seen by Dr. Adams in relation to his blood pressure and skin issues. Dkt. No. 145-1 at 103. On that date, Dr. Adams noted that plaintiff was taking ibuprofen three times per day and that he did not appear to be in any acute pain, which might warrant a change to his prescriptions. Dkt. No. 144-12 at 4, 6-7; *see* Dkt. No. 145-1 at 103.

Dr. Adams also noted that plaintiff had tried various treatments for his skin with limited results. *Id.* at 103; *see* Dkt. No. 144-12 at 5. After a dermatological assessment, Dr. Adams concluded that plaintiff was presenting with symptoms consistent with psoriasis and a possible skin infection, and prescribed him antibiotics and Clobetasol. Dkt. No. 145-1 at 103; Dkt. No. 144-12 at 5. According to Dr. Adams, given the non-serious nature of plaintiff's complaints, he believed that an outside dermatology consult was unnecessary. Dkt. No. 144-12 at 5.

4.    Defendant Steven Fries

Defendant Steven Fries ("P.A. Fries"), a physician's assistant, was previously employed by DOCCS, and had the opportunity to examine and treatment plaintiff on three occasions. Dkt. 145-1, at 105, 109, 129; *see* Dkt. No. 144-6 at 1-3. During those visits, P.A. Fries prescribed him the same skin cream that "did[ not] work." Dkt. No. 91 at 30-31. In addition, P.A. Fries refused to prescribe a narcotic pain medication, which according to plaintiff, an orthopedic specialist had previously prescribed. *Id.* According to P.A. Fries, however, plaintiff has been prescribed "Ibuprofen as an appropriate alternative to a narcotic-like pain control medication, such as Ultram." Dkt. No. 144-6 at 4, 8.

According to plaintiff, at the first visit on November 19, 2012, P.A. Fries stated that he did not "care about how many grievances or medical complaints [plaintiff] wrote, [he] still was [not] going to prescribe narcotic pain medication, as were previously prescribed by an orthopedic specialist." Dkt. No. 91 at 30. Although P.A. Fries unequivocally denies making this statement, he notes that plaintiff did not appear to be in "acute distress of discomfort" and that he indicated that "he was okay." Dkt. No. 144-6 at 4-5. Moreover, the contemporaneous medical records indicated that the primary purpose of the visit was in follow-up regarding plaintiff's

blood pressure medication. Dkt. No. 145-1 at 105; *see* Dkt. No. 144-6. P

At the second examination on December 18, 2012, plaintiff was again seen primarily regarding his blood pressure medication, which was "well-controlled." Dkt. No. 145-1 at 109. P.A. Fries further noted that plaintiff needed to have his Clobetasol prescription renewed. *Id.* In support of the motion for summary judgment, P.A. Fries indicates that he did not have any reason to believe that the cream "was not effectively treating [plaintiff's] condition at that time." Dkt. No. 144-6 at 5-6.

Plaintiff was seen by P.A. Fries for a final time on March 26, 2013, again with respect to plaintiff's his blood pressure. Dkt. No. 145-1 at 129. After conducting an examination, P.A. Fries did not observe plaintiff as being in any discomfort or distress. Dkt. No. 145-1 at 7; *see* Dkt. No. 144-6 at 7-8

### 5.    Defendant Christopher Towler

Defendant Christopher Towler ("Towler"), a physical therapist, provided physical therapy services to inmates at the UCF as an employee of Adirondack Physical and Occupational Therapy. Dkt. No. 144-5 at 2. Defendant Towler was responsible for evaluating inmates, determining whether their condition warranted physical therapy, and making a recommendation regarding those services to DOCCS. *Id.* Plaintiff alleges

that he was evaluated by defendant Towler, but that he was not referred for physical therapy. Dkt. No. 91 at 20-21. Defendant Towler told plaintiff that he was "young man" and that "he would okay." *Id.*

Although defendant Towler denies making that particular statement, plaintiff's allegations are somewhat consistent with defendant Towler's treatment notes from the evaluation on June 25, 2012, which reveal that plaintiff was complaining of muscle spasms and pain. Dkt. No. 145-3 at 70; *see also* Dkt. No. 91-1 at 20. Defendant Towler observed that plaintiff was forty-three years old and that recent x-rays revealed normal anatomic alignment, without any significant degenerative changes. Dkt. No. 145-3 at 70; Dkt. No. 144-5 at 5-6. Following an evaluation, defendant Towler concluded that physical therapy would not be beneficial. Dkt. No. 145-3 at 70; Dkt. No. 144-5 at 6. Defendant Towler recommended that plaintiff should instead engage in self-care, such as self-massage, ambulation, and hydration. Dkt. No. 144-5 at 5-7.[12]

6.    Defendant Glenn Schroyer

Defendant Glenn Schroyer ("Dr. Schroyer"), a physician, is generally

---

[12]    There is some reference in the current record before the court that plaintiff filed a grievance regarding his denial of physical therapy, and that the grievance was consolidated with one that was previously filed. Dkt. No. 91-1 at 21 ("consolidate with UST 49831-12). It appears that the consolidated grievance was fully exhausted. *Id.* at 22.

responsible for overseeing medical staff at the UCF. Dkt. No. 144-7 at 1-2.

Plaintiff alleges that he made Dr. Schroyer aware he was "denied pain

med[ication], skin disease treatment . . . access to [an] outside specialist"

for two years. Dkt. No. 91 at 19-20. Despite this awareness, Dr. Schroyer

failed to conduct an investigation into plaintiff's complaints and, according

to plaintiff, "intentionally misle[d]" Prisoners' Legal Services ("PLS") by

claiming that plaintiff's medical needs were being met. *Id.* at 19.

According to the documentation submitted with plaintiff's amended

complaint, which defendants refer to in support of their summary judgment

motion, plaintiff wrote to PLS on January 2, 2012, requesting assistance

and indicating that he had been denied medical treatment by the UCF.

Dkt. No. 91-1 at 15-16. In an undated letter to PLS, Dr. Schroyer stated

that

> In answer to your letter dated June 5, 2012, I have
> reviewed [plaintiff's] status. Per your request, he
> was seen and evaluated by his assigned medical
> provider on 6-12-12. I feel his medical problems are
> being addressed at this time[.]

Dkt. No. 91-1 at 19. Dr. Schroyer's letter was forwarded to plaintiff from

personnel at PLS, who also indicated that after a review of the relevant

medical records, the organization believed "that the facility['s] medical

department is dealing appropriately with your complaints." Dkt. No. 91-1 at

18.

### 7.    Defendant Glenn Koenigsmann

Defendant Glenn Koenigsmann ("Dr. Koenigsmann"), a physician, is employed as the DOCCS Deputy Commissioner/Chief Medical Officer. Dkt. No. 144-8 at 1. In that capacity, he is responsible for "facilitating the provision of adequate medical care and treatment to all 50,000 plus inmates in the custody and care of DOCCS." *Id.* at 2. Plaintiff alleges that whenever he complained to Dr. Koenigsmann regarding the inadequacy of his medical care, Dr. Koenigsmann wrote back to him, indicating that he should continue to follow-up with plaintiff's medical providers. Dkt. No. 91 at 27-28; *see also* Dkt. No. 91-1 at 32, 39, 40. In addition, plaintiff alleges that Dr. Koenigsmann violated his constitutional right to adequate medical care "by allowing [the UCF's medical] staff to create policies that blatantly den[y] him and all . . . SHU inmates[] access to medical care." Dkt. No. 91 at 28-29. In

## II.    PROCEDURAL HISTORY

Plaintiff commenced this action on December 23, 2013, by the filing of a complaint and an accompanying application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 5-6. Plaintiff's complaint asserted two causes of action pursuant to 42 U.S.C. § 1983, and named seven defendants, all

of whom were employed at the UCF. *See generally* Dkt. No. 1. On June 30, 2014, Senior District Judge Lawrence E. Kahn issued a memorandum-decision and order, pursuant to 28 U.S.C. §§ 1915(e), 1915A, in which he granted plaintiff's IFP application and limited plaintiff's retaliation claim. Dkt. No. 10.

Prior to close of discovery, on March 16, 2015, plaintiff filed a motion for summary judgment. Dkt. No. 47. That motion was followed on July 20, 2015, with a cross-motion for summary judgment by defendants. Dkt. Nos. 47, 67. While the parties' motions were pending, plaintiff moved for leave to file an amended complaint on November 23, 2015, effectively requesting that defendant Towler be substituted in place of defendant William Pena. Dkt. No. 88. Defendants did not oppose plaintiff's motion to amend.

By memorandum-decision and order dated January 19, 2016, Senior District Judge Kahn granted plaintiff's motion to amend his complaint, and denied the parties' respective motions for summary judgment as moot. Dkt. No. 90. As a result of the foregoing, the following claims and defendants remain for consideration: (1) an Eighth Amendment medical indifference claim asserted against defendants N.P. Parmer, Nurse Holmes, Dr. Adams, Towler, P.A. Fries, Dr. Schroyer, and Dr.

Koenigsmann; and (2) a First Amendment retaliation claim asserted against Nurse Holmes.

On March 22, 2017, following the close of discovery, defendants filed a summary judgment motion seeking dismissal of plaintiff's remaining claims. Dkt. No. 144. In their motion, defendants argue that (1) plaintiff's medical condition does not rise to a level of sufficient seriousness for purposes of an Eighth Amendment claim; (2) the undisputed evidence indicates that plaintiff received adequate and appropriate medical care at all times; and (3) plaintiff has not shown that there was a causal connection between his allegedly protected activity and the false misbehavior report issued by Nurse Holmes. *See generally* Dkt. No. 144-14. Defendants argue that they are shielded from liability on the basis of Eleventh Amendment immunity, to the extent they are sued for damages in their official capacities, and by qualified immunity. *See generally id.*

Plaintiff has responded in opposition to defendants' motion. *See* Dkt. No. 149. The motion, which is now fully briefed, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

A.    <u>Legal Standard Governing Motions Summary Judgment</u>

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "I the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or

otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Empr's' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-508 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B.    Eighth Amendment Deliberate Medical Indifference Claim

In his complaint, plaintiff asserts an Eighth Amendment medical indifference claim against all defendants, arising from allegations that he was denied appropriate medical care for his skin condition and the residual effects of a gunshot wound, which he sustained in 1993. *See generally* Dkt. No. 91. In support of their motion, defendants argue that there is no evidence that plaintiff's skin condition rose to the level of a sufficiently serious medical condition. Dkt. No. 144-14 at 19. Defendants

also argue that plaintiff was, at all times, provided with adequate and appropriate medical care by DOCCS medical staff. *Id.* at 10-24. In response to defendants' motion, plaintiff argues that defendants either denied him access to medical care or provided him medical care that was ineffective in response to his serious medical conditions. Dkt. No. 149-1 at 4-13.

### 1.    Legal Standard

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society[,]' or which 'involve the unnecessary and wanton infliction of pain[.]'" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) and *Gregg v. Georgia*, 428 U.S. 153, 169-73 (1976) (citations omitted)). While the Eighth Amendment "'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle,* 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, . . . may actually produce physical torture or lingering death, [and] . . . [i]n less serious

cases, . . . may result in pain and suffering no one suggests would serve any penological purpose." *Id.*

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, 697 F. Supp. 2d 344, 356 (E.D.N.Y. 2010). To satisfy the objective requirement, the Second Circuit has said that

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care . . . . Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

*Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006) (citations omitted).

The second inquiry of the objective test requires a court to look at the seriousness of the inmate's medical condition if the plaintiff alleges a complete failure to provide treatment. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). "Factors relevant to the seriousness of a medical

condition include whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (quotation marks and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin*, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quoting *Smith*, 316 F.3d at 185) (quotations marks omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases . . . , the official's state of mind need not reach the level of knowing and purposeful infliction of harm;

it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer,* 511 U.S. at 837); *see also Leach v. Dufrain,* 103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., *adopting report and recommendation by* Homer, M.J.).[13] "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40).

2.   Analysis

In this case, while plaintiff occasionally frames his allegations against defendants as a complete deprivation of medical treatment, it is clear that his claims, by and large, represent little more than his disagreement over the course of his medical treatment; without more, such disagreement, however "does not create a constitutional claim." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998); *accord, Fuller v.*

---

[13]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

*Lantz*, 549 F. App'x 18, 21 (2d Cir. 2013); see also *Estelle*, 429 U.S. at 107 (concluding that a medical professional's decision regarding which diagnostic techniques or forms of treatment are indicated "is a classic example of a matter for medical judgment" and does not give rise to a constitutional claim). At times, however, plaintiff's claims fall closer to an allegation that he was denied adequate medical care, which requires a narrower inquiry into seriousness. *See Salahuddin*, 467 F.3d at 279.

Addressing first the objective element of the governing test, I note that the record evidence demonstrates plaintiff was often treated for his complaints regarding his skin condition and left leg pain. *See generally* Dkt. No. 145-1. Although plaintiff frequently complained of pain regarding his medical condition or a "burning" sensation regarding his skin condition, the medical records simply do not support any claim that the pain he suffered, even if chronic, was severe. Indeed, the medical personnel that treated plaintiff frequently documented that plaintiff did not present in any acute distress. *See e.g.*, *id.* at 103, 105. In addition, while plaintiff habitually requested sick call, he would sporadically refuse to comply with the specified sick cell procedures by having his light off or being generally uncooperative. *See, e.g.*, *id.* at 78. The evidence before the court further

reveals that plaintiff often refused his pain medication. Dkt. No. 145-3 at 4-12. Based upon these circumstances, it is doubtful that a reasonable factfinder could conclude that plaintiff's skin and leg conditions were sufficiently severe as to support the objective requirement of the controlling test.

I further conclude that no reasonable factfinder could conclude that defendants' treatment of plaintiff's skin condition and leg pain was inadequate or, to the extent it could be construed as inadequate, that it was sufficiently serious. In *Dean v. Coughlin*, 804 F.2d 207 (2d Cir. 1986) the Second Circuit observed that a "correctional facility is not a health spa, but a prison in which convicted felons are incarcerated." *Id.* at 215; *see also Clay v. D'Silva*, No. 9:09-CV-1245 (GTS/DRH), 2011 WL 1135937, *3 (N.D.N.Y. Mar. 25, 2011). Accordingly, the Eighth Amendment does not afford prisoners a right to medical treatment of their choosing. The question of what treatment should be administered to an inmate is a "classic example of a matter for medical judgment," and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle*, 429 U.S. at 107; *Chance*, 143 F.3d at 703; *Rosales v. Coughlin*, 10 F. Supp. 2d 261, 264 (W.D.N.Y. 1998).

Plaintiff's claim against N.P. Parmer is based upon plaintiff's desire to be prescribed certain, specified medicated creams and lotions for his skin condition. Instead of prescribing those medications, N.P. Parmer prescribed two topical creams and Neutrogena soap. Dkt. No. 144-11 at 3; Dkt. No. 145-1 at 62, 65, 66-84. Plaintiff is simply not entitled to the medical treatment of his choosing. There is nothing in the record now before the court to suggest that N.P. Parmer's decision was anything other than an appropriate exercise of his discretion to determine the method of care and treatment to provide to plaintiff. *Estelle*, 429 U.S. at 107

With respect to Dr. Adams, plaintiff complains that Dr. Adams did not prescribe him narcotic pain medication, refer him for a dermatologist consultation, or prescribe certain medications for his skin condition. However, based upon the non-serious nature of plaintiff's complaints, Dr. Adams concluded that a dermatology consult was unnecessary, but nonetheless prescribed antibiotics and skin cream to address plaintiff's complaints. Plaintiff also did not appear to be in any acute distress, and Dr. Adams continued with the same pain medications that plaintiff had been receiving. Again, plaintiff's complaints constitute a mere disagreement regarding the course of his medical treatment, which does not give rise to a constitutional right or sustain a claim under section 1983.

*United States ex rel. Hyde v. McGinnis*, 429 F.2d 864, 867 (2d Cir. 1970) (citation omitted); *see, e.g., Rush v. Fischer*, 923 F. Supp. 2d 545, 555 (S.D.N.Y. 2013) ("The decision to prescribe one form of pain medication in place of another does not constitute deliberate indifference to a prisoner's serious medical needs"); *Harris v. Westchester Cnty. Med. Ctr.*, No. 08 Civ. 1128, 2011 WL 2637429, at *3 (S.D.N.Y. Jul. 6, 2011) ("The failure to provide stronger pain medication does not constitute deliberate indifference.").

Plaintiff's complaints regarding P.A. Fries are similar to those asserted against N.P. Parmer and Dr. Adams. In particular, plaintiff complains that P.A. Fries refused to prescribe narcotic pain medications or change the prescriptions for his skin condition. The record before the court clearly demonstrates that P.A. Fries' decision to continue the same prescriptions was also an appropriate exercise of medical discretion. *Estelle*, 429 U.S. at 107; see *Rush*, 923 F. Supp. 2d at 555; *Harris*, 2011 WL 2637429, at *3.

Plaintiff also disagrees with the medical treatment provided by defendant Towler. Although plaintiff wished to receive physical therapy for his left leg, defendant Towler concluded, after an evaluation, that physical therapy would not prove beneficial in plaintiff's situation, and instead

provided plaintiff with self-care instructions. Defendant Towler's decision regarding the appropriate course of treatment does not create a constitutional claim and plaintiff's claim is nothing more than disagreement regarding professional medical judgment. *See Hyde*, 429 F.2d at 867.

With respect to Nurse Holmes, plaintiff's allegations generally boil down to a complaint that she was rude, hostile, or otherwise mean to him during the time he was housed at the UCF. Such allegations are insufficient to give rise to a claim for deliberate indifference. *Cf. Smith v. Goord*, No. 9:08 Civ. 1364 (NAM/RFT), 2010 WL 3488148, at *6 (N.D.N.Y. Aug. 9, 2010) ("[V]erbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983.").

Even assuming that plaintiff could satisfy the objective prong, I find that no reasonable factfinder could conclude that any of the defendants acted with the requisite deliberate indifference. The record reflects that on every occasion that plaintiff was seen, his concerns were addressed, albeit apparently not to plaintiff's liking. When plaintiff's complaints regarding his left leg persisted, an updated x-ray was ordered, which revealed normal anatomic alignment, without any significant degenerative

changes. Dkt. No. 145-3 at 70. Despite a lack of objective findings, plaintiff was referred for a physical therapy consultation, with the physical therapist concluding that it would not provide any medical benefit. *See id.* In addition, plaintiff was consistently prescribed medication for his skin condition, which had a tendency to disappear and reappear. Simply stated, based upon a careful review of the record, I find nothing to suggest that defendants turned a blind eye to plaintiff's condition or failed to act while aware of a substantial risk of harm to plaintiff's health or safety.

Finally, for the same reasons that plaintiff's claims against defendants Nurse Holmes, N.P. Parmer, Dr. Adams, P.A. Fries, and Towler fail, plaintiff's claims against Drs. Schroyer and Koenigsmann must also fail. Although plaintiff alleges that Drs. Schroyer and Koenigsmann failed to facilitate his receipt of adequate medical care, plaintiff's allegations are premised on the assumption that an underlying constitutional violation occurred. The absence of deliberative indifference forecloses plaintiff's claims against defendants Schroyer and Koenigsmann. *See Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003).

Based on the foregoing evidence, I conclude that no reasonable factfinder could find, objectively, defendants deprived plaintiff of adequate

medical care, or that subjectively, any of them exhibited deliberate indifference to plaintiff's serious medical needs. According, I recommend that plaintiff's Eighth Amendment deliberate medical indifference claim be dismissed in its entirety.

### C.   First Amendment Retaliation

In his complaint, as construed by Senior District Judge Kahn, plaintiff asserts that Nurse Holmes issued a false misbehavior report in August 2011, in retaliation for his having complained to N.P. Parmer about his crushed and dissolved medication. Dkt. No. 91 at 24; *see* Dkt. No. 10 at 9. In support of their motion, defendants argue that plaintiff's retaliation claim is baseless because he is unable to demonstrate a causal connection between the change in his medication and the inmate misbehavior report issued by Nurse Holmes on August 3, 2011. Dkt. No. 144-14 at 15.

### 1.   Legal Standard

An inmate's rights are violated when a prison official takes adverse action against him, motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution

or federal laws."); *Franco v. Kelly*, 854 F.2d 584, 588-90 (2d Cir. 1988). As

the Second Circuit has repeatedly cautioned, however, because such

claims are easily incanted and inmates often attribute adverse action,

including the issuance of misbehavior reports, to retaliatory animus, courts

must approach such claims "with skepticism and particular care." *Dawes v.*

*Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by*

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *accord, Davis*, 320

F.3d at 352.

　　To establish a *prima facie* claim under section 1983 for retaliatory

conduct, a plaintiff must prove that (1) he engaged in protected conducted,

(2) the defendants took adverse action against him, and (3) there was a

causal connection between the protected activity and the adverse action –

in other words, that the protected conduct was a "substantial or motivating

factor" in the prison officials' decision to take action against the plaintiff.

*Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287

(1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v.*

*Reynolds*, No. 99-CV-2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3,

2003) (Sharpe, M.J.). For conduct to qualify as adverse for purposes of

satisfying this test, it must "deter a similarly situated individual of ordinary

firmness from exercising his or her constitutional rights." *Davis*, 320 F.3d

at 353. "In order to satisfy the causation requirement, allegations must be sufficient to support the inference that the speech played a substantial part in the adverse action." *Id.* at 354 (quotation marks omitted).

Analysis of retaliation claims thus requires thoughtful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him, and the evidence tending to link the two. When such claims, which are exceedingly case-specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to the entry of summary judgment dismissing plaintiff's retaliation claims. *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

    2.    Analysis

With respect to the first prong, according to plaintiff, he was dissatisfied with his course of medical treatment inasmuch as he was receiving certain medications in liquid form and those medications were causing him to suffer dizziness and stomach pains. Dkt. No. 91 at 23-24. As a result, he complained regarding the form of his medication to N.P. Parmer. Dkt. No. 91 at 23-24. Although N.P. Parmer's declaration does not

34

address whether he received any complaints from plaintiff regarding liquid medication, *see generally* Dkt. No. 144-11, plaintiff's medical records do reveal that when he was examined by N.P. Parmer on June 17, 2011, the crush and dissolve order was discontinued, which lends some support to the claim that plaintiff made a verbal complaint regarding the form of his medication on that day. Dkt. No. 145-1 at 62. Viewing the facts in a light most favorable to plaintiff, as the court must at this stage, plaintiff's verbal complaint to N.P. Parmer regarding the form of his medication could be viewed as a protected activity by a reasonable factfinder. *See, e.g., Verley v. Goord*, No. 9:05-CV-1251 (LEK/GHL), 2008 er 4279498 (N.D.N.Y. Sep. 15, 2008) (assuming, without deciding, that complaints about his medical care constituted constitutionally protected activity).

With respect to the second prong, plaintiff alleges that Nurse Holmes filed a false inmate misbehavior report against him in August 2011 as a result of his complaints. Dkt. No. 91 at 24-25. Assuming, without deciding, that the inmate misbehavior report was in fact false, it is well-established that the filing of a false misconduct report can constitute an adverse action, for purposes of a First Amendment retaliation claim. *See Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004)

Proceeding to the third prong, however, "[i]n cases involving

allegations of retaliation based on the filing of allegedly false misbehavior reports, '[t]he difficulty lies in establishing a retaliatory motive.'" *Houston v. Goord*, No. 9:03-CV-1412 (GTS/DEP), 2009 WL 890658, at *11 (Mar. 31, 2009). Conclusory allegations of retaliatory motivation are insufficient to withstand a summary judgment; to establish retaliatory animus, which ordinarily must be shown circumstantially since direct evidence of such motivation is typically lacking, a plaintiff may cite such factors as "temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Id.* (citations omitted); *see also Rivera v. Goord*, 119 F. Supp. 2d 327, 339 (S.D.N.Y. 2000).

In this case, the only evidence proffered by plaintiff that could potentially support the finding of a nexus between the protected activity and the corresponding misbehavior report is the inference to be drawn from the temporal proximity between the June 17, 2011 complaint to N.P. Parmer and the August 3, 2110 misbehavior report from Nurse Holmes. In certain instances, this temporal proximity alone is sufficient to avoid summary judgment dismissal of a retaliation claim. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (citing *Flaherty v. Coughlin*, 713. F.2d 10, 14 (2d Cir. 1983)). However, in other circumstances, temporal proximity alone

cannot avoid summary judgment. *Williams v. Goord*, 111 F. Supp. 2d 280, 290 (S.D.N.Y. 2000) (citing *Ayers v. Stewart*, 1996 WL 346049, at *1 (2d Cir. 1999)); see also *Ethier v. City of Cohoes*, No. 1:02 Civ. 1584, 2006 WL 1007780, *7 (N.D.N.Y. April 18, 2006).

When taken in isolation, the approximate two-month time period between plaintiff's complaint and the misbehavior report might give rise to a determination by a reasonable factfinder that the misbehavior report was issued in retaliation for protected activity. However, taken together and considered in the light of all relevant facts, the present record simply does not support the inference of such a connection. Plaintiff readily admits many of the relevant facts that surround the UCF's general polices with respect to med rounds, including one-to-one medication administration and crush and dissolve orders. *See generally* Dkt. No. 149. In particular, plaintiff agrees that crush and dissolve orders are issued by physicians and that Nurse Holmes lacked the requisite authority to discontinue medication or make changes to dosages. Dkt. No. 149 at 24. In addition, plaintiff agrees that "[w]here an inmate fails to comply with the 'one to one administration of medication,' the nurse is required to write a misbehavior report to fully document the distribution of medication in the population." Dkt. No. 149. Following the August 3, 2011 incident, in which Nurse

Holmes believed that plaintiff was concealing pills, plaintiff was found guilty of refusing a direct order from Nurse Holmes. Dkt. No. 91-1 at 25.

Given the totality of these circumstances, including plaintiff's finding of guilt, and the fact that complaint regarding the form of his medication was made to N.P. Parmer but the misbehavior report was issued by Nurse Holmes, who lacked the authority to change crush and dissolve orders, no reasonable factfinder could conclude that the issuance of the August 3, 2011 misbehavior report, and the resultant finding of guilt, was prompted by retaliatory animus. Accordingly, I recommend that defendants' motion on plaintiff's First Amendment retaliation against defendant claim be granted.[14]

IV.    SUMMARY AND RECOMMENDATION

The record currently before the court demonstrates that although plaintiff did not receive the medical treatment that he preferred, he nonetheless received frequent medical care, which was designed to address his habitual complaints. The record further demonstrates that there is no evidence that the inmate misbehavior report issued by Nurse

---

[14]    As an alternative basis to grant summary judgment, defendants argue that plaintiff's claim must be dismissed because he failed to appeal his Tier II disposition and because he failed to exhaust his administrative remedies pursuant to the Prison Litigation Reform Act of 1996. Dkt. No. 144-14 at 15-17. Because I conclude that plaintiff's claim must be dismissed on the merits, I have not addressed this alternative ground raised by defendants.

Holmes to plaintiff was motivated by retaliatory animus. Under the

circumstances, I recommend that defendants' motion for summary

judgment be granted in its entirety, and that plaintiff's Eighth Amendment

medical indifference and First Amendment retaliation claims be

dismissed.[15]

Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment

(Dkt. No. 144) be GRANTED, and plaintiff's amended complaint (Dkt. No.

91) be dismissed in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report. Such objections must be filed

with the clerk of the court within FOURTEEN days of service of this

report.[16] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d),

---

[15]     In light of this determination on the merits and as previously noted, I have not
addressed defendants' Eleventh Amendment argument regarding plaintiff's damage
claims against the defendants in their official capacities.

[16]     If you are proceeding *pro se* and are served with this report and
recommendation by mail, three additional days will be added to the fourteen-day
period, meaning that you have seventeen days from the date the report and
recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If
the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then
the deadline is extended until the end of the next day that is not a Saturday, Sunday, or
legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:      March 2, 2018
            Syracuse, New York



Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C**   Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. *See* Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

> FN1. This matter was referred to the undersigned
> pursuant to 28 U.S.C. § 636(b) and
> N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.[FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. Id. at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. Id. at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. Id. at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. Id. at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. Id. at ¶¶ 22, 27-28.

II. Motion to Dismiss

*2 When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Staron v. McDonald's Corp., 51 F.3d 353, 355 (2d Cir.1995) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.), cert. denied, 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

III. Discussion

A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); Rhodes v. Chapman, 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. Farmer, 511 U.S. at 837.

1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes*, 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,* 524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at *3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at *3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2011 WL 1135937
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Daniel CLAY, Plaintiff,
v.
Dr. Mary D'SILVA, Director of Dental
Services, New York State Department
of Correctional Services, Defendant.

No. 9:09–CV–1245 (GTS/DRH).
|
March 25, 2011.

**Attorneys and Law Firms**

Daniel Clay, Auburn, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, James Seaman, Esq., Assistant Attorney General, Albany, NY, for Defendant.

**Opinion**

### *MEMORANDUM–DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* prisoner civil rights action filed by Daniel Clay ("Plaintiff") against New York State Department of Correctional Services Director of Dental Services Dr. Mary D' Silva ("Defendant"), are (1) Defendant's motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6) ( Dkt. No. 12), and (2) United States Magistrate Judge David R. Homer's Report–Recommendation recommending that Defendant's motion be granted (Dkt. No. 21). Plaintiff has not submitted any Objections to the Report–Recommendation, and the time in which to do so has expired. For the reasons set forth below, the Report–Recommendation is accepted and adopted in its entirety; Defendant's motion is granted; and Plaintiff's Complaint is dismissed.

## I. RELEVANT BACKGROUND

Plaintiff filed his Complaint in this action on November 6, 2009. (Dkt. Nos.1, 9.) The factual allegations of Plaintiff's Complaint are accurately recited in Magistrate Judge Homer's Report–Recommendation. (Dkt. No. 21, at 2–3.) The Court will not repeat that recitation in this Decision and Order, which is intended primarily for review by the parties. The Court will note only that, generally, construed with the utmost of liberality, Plaintiff's Complaint alleges that, between October 2006 and November 2009, while he was incarcerated at Clinton Correctional Facility ("Clinton C.F.") in Dannemora, New York, Defendant violated his constitutional rights by causing him to experience unnecessary pain due to delayed dental treatment. (*See generally* Dkt. No. 1 [Plf .'s Compl.]; Dkt. No. 9 [Exs. to Plf.'s Compl.].). More specifically, Plaintiff alleges that, during the time period in question, (1) he experienced unnecessary pain while waiting for the removal of three tooth fragments that remained in his gums following the extraction of one of his teeth on October 11, 2006, and (2) that the delays and pain he experienced was due to Defendant's failure to fulfill her duty to make sure there are a sufficient number of dentists at Clinton C.F. to treat the dental needs of the large population of inmates incarcerated there. (*Id.*) Based on these factual allegations, Plaintiff asserts a claim for deliberate indifference to his serious medical needs, in violation the Eighth Amendment. (*Id.*)

On March 10, 2010, Defendant filed a motion to dismiss the action for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 12.) Generally, in support of her motion, Defendant asserts the following three arguments: (1) Plaintiff has failed to allege facts plausibly suggesting a claim for deliberate indifference to his serious medical needs because, *inter alia,* (a) he has failed to allege facts plausibly suggesting that Defendant acted with a sufficiently culpable state of mind during the time in question, and (b) indeed, Plaintiff alleges that there were three dentists at Clinton C.F. during the time in question; (2) Plaintiff has failed to allege facts plausibly suggesting a causal connection between anything Defendant did or did not do (regarding the staffing of dentists at Clinton C.F.) and the scheduling delays that Plaintiff allegedly experienced, which were caused by office staff; and (3) based on the factual allegations asserted in Plaintiff's Complaint, Defendant is protected from liability as a matter of law by the doctrine of qualified immunity. (*Id.*)

Clay v. D'Silva, Not Reported in F.Supp.2d (2011)
Case 9:13-cv-01577-LEK-DEP   Document 153   Filed 03/05/18   Page 47 of 87
2011 WL 1135937

**\*2** On April 28, 2010, after being granted an extension of time in which to do so, Plaintiff filed a response in opposition to Defendants' motion. (Dkt. Nos.15, 16.) Construed with the utmost of special liberality, Plaintiff's response challenges each of the three arguments asserted by Defendants. (*Id.*) Among other things, Plaintiff argues that (1) the third dentist arrived at Clinton C.F. only a "few months" before he filed his Complaint in this action; and (2) a memorandum from "S. Garman, ADSP" at Clinton C.F. dated October 18, 2007, refers to "the vacancy rate of Dental personnel statement and ... [the need] to help recruit and retain Dental professionals," plausibly suggesting a causal connection between anything Defendant did or did not do (regarding the staffing of dentists at Clinton C.F.) and the scheduling delays that Plaintiff allegedly experienced. (*Id.*)

On February 1, 2011, Magistrate Judge Homer issued a Report–Recommendation recommending that Defendant's motion be granted and that Plaintiff's Complaint be dismissed. (Dkt. No. 21.) Generally, in support of his recommendation, Magistrate Judge Homer found that Plaintiff had failed to allege facts plausibly suggesting that Defendant was deliberately indifferent to his serious medical needs. (*Id.*) Familiarity with the remaining grounds of Magistrate Judge Homer's Report–Recommendation is assumed in this Decision and Order, which is intended primarily for the review of the parties. (*Id.*)

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b) (1)(C).[1] When only general objections are made a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at \*2–3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion, 175 F.3d 1007 (2d Cir.1999).*[2] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94–CV–2826, 1995 WL

453299, at \*1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

### B. Standard Governing a Motion to Dismiss

Magistrate Judge Homer correctly recited the legal standard governing a motion to dismiss for failure to state a claim upon which relief can be granted. (Dkt. No. 21.) As a result, this standard is incorporated by reference in this Decision and Order. The Court would add only one point.

**\*3** While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[3] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[4] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson v. Onondaga County,* 549 F. Supp .2d 204, 214 & n. 28 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation of Lowe, M.J., on *de novo* review) [citations omitted].

## III. ANALYSIS

Plaintiff has not filed objections to the Report–Recommendation. As a result, the Court need only review the Report–Recommendation for clear error.

After carefully reviewing all of the papers in this action, including Magistrate Judge Homer's Report–Recommendation, the Court concludes that Magistrate Judge Homer's thorough Report–Recommendation is correct in all respects. (Dkt. No. 21.) Magistrate Judge Homer employed the proper legal standards, accurately recited the facts, and reasonably applied the law to those facts. (*Id.*) As a result, the Court accepts and adopts the Report–Recommendation in its entirety for the reasons stated therein. (*Id.*) Among these reasons are

Clay v. D'Silva, Not Reported in F.Supp.2d (2011)
Case 9:13-cv-01577-LEK-DEP   Document 153   Filed 03/05/18   Page 48 of 87
2011 WL 1135937

the following: (1) Plaintiff has not alleged facts plausibly suggesting that he was actually harmed by any under-staffing of dentists at Clinton C.F. during the time in question (given that, as the body Plaintiff's Complaint alleges, he received repeated dental care from two different dentists during the majority of the time in question); and (2) even if he has alleged such facts, he has not alleged facts plausibly suggesting that complete dental staffing was possible (given that, as asserted in the Clinton C.F. internal memorandum attached to Plaintiff's Complaint, there was a shortage in the supply of dentists statewide). (*Id.*)

The court would add only four points. First, the Report–Recommendation would survive even a *de novo* review.

Second, the repeated dental care that Plaintiff received from three dentists (i.e., Drs. P.J. Kullman, Tahir R. Farooki, and R. Oliveira) at Clinton C.F. during the time in question included two x-ray examinations and three oral surgeries. (*See generally* Dkt. No. 1.) Plaintiff's claim is essentially a complaint regarding the perfection and speed with which those dentists provided him dental care. As the Second Circuit has explained:

> It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for dental care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of prisoners would not in freedom or on parole enjoy the excellence in [medical] care which plaintiff[ ] understandably seeks.... We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution.... The Constitution does not command that inmates be given the kind of

medical attention that judges would wish to have for themselves....

**\*4** *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) [internal quotation marks and citations omitted].

Third, while Plaintiff has submitted a Clinton C.F. internal memorandum indicating that the medical department at Clinton C.F. had a problem with the recruitment and retention of dental staff (due to a shortage in the supply of dentists statewide), that internal memorandum—which does not indicate it was sent to Defendant, or the source of a communication with Defendant—does not plausibly suggest that Defendant knew, or reasonably should have known, that Clinton C.F. did not have enough dentists to fulfill its obligations under the Eighth Amendment. (Dkt. No. 9, at 43–45 [Ex. L to Plf.'s Compl.].)

Fourth, the Court notes that, under the circumstances, it need not afford Plaintiff an opportunity to amend his Complaint before dismissal. Affording a *pro se* civil rights plaintiff an opportunity to amend his complaint before dismissal is not required where (1) the plaintiff has already been afforded the opportunity to amend,[5] or (2) the defects in the plaintiff's claims are substantive rather than merely formal, such that any amendment would be futile.[6] Here, it is arguable that Plaintiff has already been afforded the opportunity to amend, through the Court's extra-liberal construction of his papers in response to Defendant's motion as effectively amending the allegations of his Complaint (for example, his allegation, in his response papers, that the third dentist at Clinton C.F. arrived there only "a few months" before he filed his Complaint). In any event, even if that extra-liberal construction did not constitute an opportunity to amend, the Court finds that, even when construed with the utmost of special liberality, Plaintiff's claims are fatally plagued by defects that are substantive rather than merely formal, such that any amendment would be futile.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Homer's Report–Recommendation (Dkt. No. 21) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendant's motion to dismiss (Dkt. No. 12) is *GRANTED,* and Plaintiff's Complaint (Dkt. No. 1) is *DISMISSED.*

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1135937

Footnotes

1   On *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g .*, *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994)* ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

2   *See also Vargas v. Keane,* 93–CV–7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec. 12, 1994) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895 (1996).

3   *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) [citing cases].

4   *See Vega,* 610 F.Supp.2d at 196, n. 10 [citing cases].

5   *Shuler v. Brown,* 07–CV–0937, 2009 WL 790973, at *5 & n. 25 (N.D.N.Y. March 23, 2009) (McAvoy, J., adopting Report–Recommendation by Lowe, M.J.) ("Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint."), *accord, Smith v. Fischer,* 07–CV–1264, 2009 WL 632890, at *5 & n. 20 (N.D.N.Y. March 9, 2009) (Hurd, J., adopting Report–Recommendation by Lowe, M.J.); *Abascal v. Hilton,* 04–CV–1401, 2008 WL 268366, at *8 (N.D.N.Y. Jan.130 2008) (Kahn, J., adopting, on de novo review, Report–Recommendation by Lowe, M.J.); *see also Yang v. New York City Trans. Auth.,* 01–CV–3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct. 24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once); *cf. Foman v. Davis,* 371 U.S. 178, 182 (1962) (denial of leave to amend not abuse of discretion movant has repeatedly failed to cure deficiencies in pleading).

6   As the Second Circuit has explained, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) (citations omitted), *accord, Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) ("[T]he court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile.") (citation omitted); *see also Foman v.. Davis,* 371 U.S. 178, 182 (1962) (denial not abuse of discretion where amendment would be futile); *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with Cuoco's causes of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied.") (citation omitted); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (citation omitted); *Health–Chem Corp. v. Baker,* 915 F.2d 805, 810 (2d Cir.1990) ("[W]here ... there is no merit in the proposed amendments, leave to amend should be denied"). This rule applies even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103; *Brown,* 1997 WL 599355 at *1.

---

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 2637429
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Robert HARRIS, Plaintiff,
v.
WESTCHESTER COUNTY MEDICAL
CENTER, Dr. McGill, Westchester County
Department of Corrections, Superintendent
Rocco Pozzi, NP—Maria Taylor and
PA—Norris Nosworthy, Defendants.

No. 08 Civ. 1128(RJH).
|
July 6, 2011.

Opinion

### *MEMORANDUM OPINION AND ORDER*

RICHARD J. HOLWELL, District Judge.

**\*1** Plaintiff *pro se* Robert Harris, currently incarcerated at Oneida Correctional Facility, commenced this action on February 4, 2008, alleging deliberate indifference to his medical needs in violation of 42 U.S.C. § 1983. Now before the Court is defendants' motion to dismiss. For the reasons that follow, that motion is GRANTED.

### BACKGROUND

For the purposes of this motion, the following facts are taken as true.

On May 15, 2007, Harris injured his left pinky finger while playing basketball. (Third Amended Complaint ("Compl.") at unnumbered pg. 4.) He was seen that day by the medical staff at Valhalla Correctional Facility ("Valhalla"), where he was then incarcerated, given ibuprofen, and returned to his cell. (Typewritten Attachment to Compl. ("Compl.Attach.") at unnumbered pg. 1.) Every night, Harris was given ibuprofen until May 22, 2007, when he was given an x-ray examination. (*Id.*) Harris alleges that he was in "constant and unbated [sic] pain" during that time. (*Id.*)

On May 22, 2007, Nurse Practitioner Maria Taylor took x-rays of Harris's hand, which showed no broken bones. (*Id.*) She then gave Harris ibuprofen despite his protests that ibuprofen left him in pain. (*Id.*) A day or two later, Harris requested stronger medication, but Taylor denied his request. (*Id.*)

On May 25, 2007, Harris underwent another x-ray exam, and Taylor told him that he had a severe dislocation and torn ligaments in his left pinky finger. (*Id.*) Harris again requested stronger medication, but Taylor denied the request. (*Id.*)

About two months later, Harris was taken to Westchester County Medical Center, where Dr. McGill performed surgery on his left pinky. (*Id.* at 3.) In doing so, McGill inserted a pin in Harris's pinky without informing Harris that he would do so. (*Id.* at 3, 4.) Harris alleges that as a consequence, his finger is permanently bent, and he cannot straighten it out. (*Id.* at 3.) Harris was returned to Valhalla, seen at the infirmary, was sent back to general population "even though [he] was heavily sedated, groggy, and in severe pain." (*Id.*) Harris requested to stay overnight in the infirmary, but that request was denied. (*Id.*) His placement in general population was in the top tier, meaning that he "had to walk down the stairs to get [his] food," and was "bumped into by other inmates which caused [him] severe pain in his left pinky." (*Id.*) When it was time to receive his pain medication, Physician Assistant Norris Nosworthy gave him Tylenol "instead of the Vicodin that Dr. McGill prescribed." (*Id.*)

Harris's pinky was bandaged and tied to his ring finger. (*Id.* at 3, 4.) Harris was told that the bandages would be on for six to eight weeks, but they were on for twelve weeks. (*Id.* at 4.) His ring finger also became stiff during this time. (*Id.*)

The bandages were removed on October 24, 2007, and two weeks later Harris went to physical therapy. (*Id.*) He attended physical therapy at Valhalla two or three times, where the physical therapist informed him that he "should be able to get [his] ring finger back but [his] left pinky will never be the same" and that "form [sic] the looks of your pinky the surgery did'nt [sic] go well." (*Id.*) On February 16, 2008, Harris was transferred to Elmira Correctional Facility ("Elmira"). (*Id.*) While incarcerated there, he underwent physical therapy for about two months at Five Points Correctional Facility, since Elmira did not have

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 2637429

physical therapy. (*Id.* at 5.) Harris's complaint states that he "still cannot bend [his] left pinky or ring finger as of today." (*Id.*)

**\*2** Harris commenced this action on February 4, 2008. By order dated that same day, Judge Kimba M. Wood directed Harris to file an amended complaint within sixty days of the order addressing certain deficiencies in the complaint and advised Harris that failure to do so would result in dismissal. (ECF No. 3.) Specifically, Judge Wood found that Harris's allegations in his original complaint, namely that the initial x-rays showed no broken bones, that a subsequent x-ray showed severe dislocation, and that surgery was not performed until some months later failed to show deliberate indifference. (*Id.* at 3.) Harris did not timely file an amended complaint, and the complaint was dismissed without prejudice on April 11, 2008. (ECF No. 4.) On January 12, 2009, Harris moved to reopen his case, and his motion was granted by Judge Leonard B. Sand on February 6, 2009. (ECF Nos. 6, 7.) Judge Sand directed Harris to file an amended complaint within sixty days of his order, which Harris did on March 31, 2009. (ECF No. 8.) Judge Loretta A. Preska then granted Harris leave to file a second amended complaint on September 30, 2009, which Harris did on November 30, 2009. (ECF Nos. 9, 10.) The case was then reassigned to the undersigned, and Harris requested permission to file a third amended complaint to identify the Jane and John Does in his complaint. (ECF No. 13.) The Court granted him permission to do so, and he did on May 28, 2010. (*See* ECF Nos. 13–15.) On January 3, 2011, defendants brought this motion to dismiss the complaint. Prior to the resolution of this motion, Harris requested appointed counsel on April 26, 2011. (ECF No. 29.) On May 4, 2011, Magistrate Judge Kevin Nathaniel Fox denied the application, finding that Harris's complaint lacked sufficient merit to warrant appointing counsel. (ECF Nos. 29, 30.)

## DISCUSSION

### I. Standard of Review for Motion to Dismiss

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Starr v. Sony BMG Music Entm't,* 592 F.3d 314, 321 (2d Cir.2010) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009). If the factual averments permit no reasonable inference stronger than the "mere possibility of misconduct," the complaint should be dismissed. *Starr,* 592 F.3d at 321 (quoting *Iqbal,* 129 S.Ct. at 1950). Thus, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 557). In applying this standard of facial plausibility, the Court takes all "factual allegations to be true and draw[s] all reasonable inferences in the plaintiff's favor. *Harris v. Mills,* 572 F.3d 66, 71 (2d Cir.2009). But the Court does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Iqbal,* 129 S.Ct. at 1949.

**\*3** "[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007). Accordingly, "the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 475 (2d Cir.2006) (internal quotation marks and emphasis omitted).

### II. Judge Wood's February 4, 2008 Order

As an initial matter, defendants contend that plaintiff's complaint should be dismissed because he "did not file the third amended complaint until well after the 60 day time limitation established by Judge Wood." (Def.'s Mem. at 5.) But this ignores the procedural history of this case after that order, detailed above. Numerous other court orders authorized Harris's first, second, and third amended complaints, and this argument is therefore unavailing.

### III. Failure To State a Claim

Harris's action arises under 42 U.S.C. § 1983 and alleges inadequate medical care. "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104 (1976)). "The standard of deliberate indifference includes both subjective and objective components." *Id.* "Objectively, the alleged deprivation must be sufficiently

serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (internal quotation marks omitted). "[T]he subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 835 (1994)). "[M]ere allegations of negligent malpractice do not state a claim of deliberate indifference," although "certain instances of medical malpractice may rise to the level of deliberate indifference; namely, when the malpractice involves culpable recklessness." *Id.*

Harris's claim fails to meet this standard. Assuming *arguendo* that the injury to his finger constitutes a sufficiently serious medical condition, the claim of deliberate indifference is based on: (1) Taylor's initial misdiagnosis of his finger injury; (2) Taylor's failure to provide him stronger pain medication; (3) Dr. McGill's surgery on the finger; (4) Nosworthy's disbursement of Tylenol instead of Vicodin; and (5) the failure to provide an overnight stay in the infirmary. None of these allegations, however, rise to the level of deliberate indifference. As for misdiagnosis, without more, "[a]llegations of negligent treatment and misdiagnosis do not state a cause of action under the Eighth Amendment." *Anderson v. Lapolt,* No. 9:07–CV–1 184, 2009 WL 3232418, at *13 (N.D.N.Y. Oct. 1, 2009); *accord Burgess v. Cnty. of Rensselaer,* No. l:03–CV–00652 (NPM–RFT), 2006 WL 3729750, at *8 (N.D.N.Y. Dec. 18, 2006) ("[A] claim of misdiagnosis, faulty judgment, or malpractice without more to indicate deliberate indifference, is not cognizable under section 1983."). The failure to provide stronger pain medication does not constitute deliberate indifference. *See Veloz v. New York,* 339 F.Supp.2d 505, 525 (S .D.N.Y.2004) ("Differences in opinion by a doctor and a prisoner over the appropriate medication to be prescribed is a disagreement over a treatment plan and does not implicate the Eighth Amendment."); *Fernandez v. Fed. Bureau of Prisons,* No. 99 Civ. 4944(VM), 2001 WL 913929, at *2–3 (S.D.N.Y. Aug. 13, 2001) (finding that when plaintiff based his claim on defendants' "(1) not choosing to follow the Aftercare Suggestions; (2) ignoring his pleas for medical care for the pain he was experiencing; and (3) failing to provide him with adequate pain medication" that such pleadings "cannot satisfy

both prongs for establishing deliberate indifference to his medical needs"). Harris's allegations regarding the quality of Dr. McGill's surgery, or of adverse consequences from the surgery also do not amount to plausible allegations of deliberate indifference. *See Martinez v. Ravikumar,* 616 F.Supp.2d 455, 459 (S.D.N.Y.2009) ("Martinez does not allege that Ravikumar knew of and disregarded an excessive risk to her health and safety while conducting the surgery .... Rather, she alleges that Ravikumar's treatment and diagnoses were not effective. At most, Martinez alleges that Ravikumar was negligent in his performance of the surgery and subsequent examinations. Such allegations do not give rise to a valid claim of medical mistreatment under the Eighth Amendment."); *see also Middleton v. Falk,* No. 9:06–CV–1461 (GTS/DRH), 2009 WL 666397, at *8 (N.D.N.Y. Mar. 10, 2009) ("Any adverse effects which Middleton suffered as a consequence of the surgery required to attempt to correct his serious retinal detachment are, at best, negligence. As noted, negligence is insufficient to sustain a claim under the Eighth Amendment."). Nor do Harris's allegations that Nosworthy gave him Tylenol instead of Vicodin show deliberate indifference; these allegations state only the bare fact that she took those actions, and give no reason to suspect that Nosworthy acted for reasons that would subject her to Eighth Amendment liability. *See Ravenell v. Van der Steeg,* No. 05 Civ. 4042(WHP), 2007 WL 765716, at *6 (S.D.N.Y. Mar. 14, 2007) ("That Magill disagreed with Foster does not transform Foster's conservative recommendation into cruel and unusual punishment. The question of what diagnostic techniques and treatments should be administered to an inmate is a 'classic example of a matter for medical judgment'; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients." (quoting *Estelle,* 429 U.S. at 107)); *McKenna v. Wright,* No. 01 Civ. 6571(WK), 2002 WL 338375, at *8 (S.D.N.Y. Mar. 4, 2002) ("The mere fact that the defendant physicians may have made a different medical decision with respect to Plaintiff's treatment than that purportedly recommended by Dr. Maliakkal does not indicate that they acted for culpable reasons."). Finally, Harris's complaint cites only his disagreement with the medical judgment of the prison infirmary staff in being transferred from the infirmary to general population after his surgery as a reason to infer deliberate indifference from that decision. (*See* Compl. Attach. at 3 ("What baffles me is that I was placed in the infirmary the night before the surgery, but the actual day of the surgery when I returned,

2011 WL 2637429

I was placed in general population.").) The complaint does not identify any details indicating deliberate indifference apart from plaintiff's own opinion that he was too sedated and groggy to be placed in general population. But the case law is clear that plaintiff's mere disagreement with the medical judgment of the prison's medical staff, even if it amounts to negligence on the staff's part, does not amount to a constitutional violation. *See, e.g., Berry v. Wright,* No. 04–CV–0074 (SR), 2011 WL 231626, at *4 (W.D.N.Y. Jan. 24, 2011) ("While plaintiff may disagree with the decisions made by the defendants in their treatment of him, it is well-settled that an issue of medical judgment is 'precisely the sort of issue that cannot form the basis of a deliberate indifference claim.' " (quoting *Hernandez v. Keane,* 341 F.3d 137, 147 (2d Cir.2003))); *see also Chance,* 143 F.3d at 703 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim.... Moreover, negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim.").

**\*4** Accordingly, Harris has failed to plead a constitutional violation in his complaint. As Harris has already amended his complaint three times after being informed of the deficiencies in his original complaint by Judge Wood, dismissal with prejudice is appropriate at this stage of the litigation. *See, e.g., Denny v. Barber,* 576 F.2d 465, 471 (2d Cir.1978) (plaintiff was not entitled to "a third go-around"); *Treppel v. Biovail Corp.,* No. 03 Civ. 3002(PKL), 2005 WL 2086339, at *12 (S.D.N.Y. Aug. 30, 2005) ("[T]he Court finds that leave to amend would be futile because plaintiff has already had two bites at the apple and they have proven fruitless.").

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss **[22]** is GRANTED and the action is dismissed with prejudice. The Clerk of the Court is requested to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 2637429

---

    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

    © 2018 Thomson Reuters. No claim to original U.S. Government Works.



Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Troy GARRETT, Plaintiff,
v.
Edward REYNOLDS, Superintendent, Mohawk Corr.
Facility; James A. Mance, Deputy Superintendent of
Programs; John O'Reilly,[FN1] Deputy Superintendent; J.
Burge, First Deputy; M. Maher, DSS; R. Centore,
Correctional Officer, Defendants.

> FN1. In this case, the defendants maintain and
> the docket confirms that defendant John O'Reilly
> has never been served. Service must be made
> upon a defendant within 120 days of filing the
> complaint or any claims against that defendant
> will be dismissed. See Fed.R.Civ.P. 4(m). The
> original complaint, which named O'Reilly, was
> filed on November 26, 1999, and the amended
> complaint was filed on July 13, 2001. However,
> O'Reilly was never served. Since this defendant
> has never been served, this court lacks
> jurisdiction over him, and this court recommends
> the dismissal of this defendant.

No. Civ.9:99CV2065NAMGLS.

Oct. 7, 2003.
Troy Garrett, Peekskill, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General State of New York,
Syracuse, NY, for the Defendants.

Maria Moran, Asst. Attorney General, of counsel.

*REPORT-RECOMMENDATION*

SHARPE, Magistrate J.
    I. *Introduction* [FN2]
> FN2. This matter was referred to the undersigned
> for a Report-Recommendation by the Hon.

Norman A. Mordue, United States District
Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and
Local Rule 72.3(c).

    **\*1** Plaintiff, *pro se* Troy Garrett filed an action under
42 U.S.C. § 1983 claiming that the defendants violated his
civil rights when they retaliated against him for his
activities as an IGRC representative by subjecting him to
verbal harassment, physical abuse and subsequently, a
transfer. Garrett also claims that the supervisory
defendants failed to properly investigate his complaints
and failed to train/supervise their employees. This court
recommends denying the motion for summary judgment in
part and granting it in part.

    II. *Procedural History*

    On July 13, 2001, Garrett filed an amended complaint
against the defendants claiming that they violated his civil
rights under the First, Sixth Eighth, and Fourteenth
Amendments.[FN3] On September 28, 2001, the defendants
filed a motion for summary judgment. On January 18,
2002, this court issued an order informing Garrett of his
obligation to file a response and extended his time to
respond for thirty days. On April 24, 2002, this court
granted an additional sixty days to respond to the
defendants' motion. Despite having been given multiple
opportunities to respond, Garrett has failed to file a
response.

> FN3. Although Garrett claims to be raising
> violations under the Sixth, Eighth, and
> Fourteenth Amendments, the only viable claim
> based on this court's interpretation of the
> complaint is under the First Amendment for
> retaliation.

    III. *Facts* [FN4]

> FN4. The facts are taken from the defendants'
> statement of undisputed material facts since
> Garrett failed to file a response.

    On June 17, 1999, Garrett filed a grievance against

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Officer Kelley for verbal harassment.[FN5] This grievance was denied by the Central Office Review Committee (CORC) on July 21, 1999. On March 19, 2000, Garrett filed a grievance claiming that defendant Burge used intimidation tactics. Defendant Reynolds investigated the grievance and it was denied based on a finding that no harassment occurred. Garrett appealed to the CORC and they denied the grievance on April 5, 2000. On April 10, 2000, defendant Centore wrote a misbehavior report against Garrett for creating a disturbance and employee harassment. On April 12, 2000, Lieutenant Manell presided over Garrett's Tier 2 disciplinary hearing and he was found guilty of both charges. He was given a 21 day recreation penalty, and loss of packages and commissary. However, his recreation penalty was suspended and deferred. Garrett appealed the determination and it was affirmed on April 19, 2000.

> FN5. Not a party in this suit.

On April 17, 2000, Garrett filed a grievance against Centore for harassment. Burge denied his grievance on May 4, 2000, and subsequently, the CORC denied it. On May 12, 2000, Garrett sent a letter to Burge concerning further harassment by Centore. On May 16, 2000, Garrett filed another grievance against Centore for harassment. His grievance was denied on May 26, 2000. After Garrett appealed, his grievance was again denied by the CORC. On June 22, 2000, the Superintendent's Office received a letter from Garrett alleging that Centore threw a piece of paper with a picture of a plunger and the words "always gets the job done" into his cell. He wrote a grievance against Centore for harassment due to the paper that he threw into his cell. Burge forwarded the grievance to the CORC on August 10, 2000. The CORC accepted the grievance on August 30, 2000, in order to investigate.

**\*2** On June 23, 2000, the Inspector General's Office interviewed Garrett at the Mohawk Correctional Facility regarding his complaints of Centore. That same day, Captain Naughton filed an administrative segregation recommendation. On June 29, 2000, an administrative segregation hearing was held. On July 14, 2000, Garrett was transferred [FN6] to the Mid-State Correctional Facility.

> FN6. The defendants suggest that Garrett has

failed to exhaust his administrative remedies concerning his transfer. They claim that he agreed to the transfer and participated in the administrative hearing which resulted in his transfer. The issue of transfer will not be addressed in this Report-Recommendation because the court has insufficient information to determine whether he exhausted his remedies.

Finally, Garrett filed a claim alleging that his property was lost or damaged on October 8, 1999. However, he was paid $75.00 for this claim and he signed a release on December 13, 1999.

### IV. *Discussion*

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the ... pleading, but the adverse party's response, by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56(e) ], must set forth specific facts showing that there is a genuine issue for trial." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Rexford Holdings, Inc. v. Biderman,* 21 F.3d 522, 525 (2d Cir.1994)(alternation in original) (citation omitted). However, it is well settled that on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999).

Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U .S. 519, 520 (1972); *see Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)(a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). Indeed, the Second Circuit has stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990); *see LaFond v. General Physics Serv. Corp.,* 50 F.3d 165, 171 (2d Cir.1995).

**\*3** This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, at \*2 (S.D.N.Y. May 16, 2001). More specifically, Local Rule 7.1(a)(3) of this court specifically provides that "any facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." Local Rule 7.1(a)(3) further requires that the "non-movant shall file a Statement of Material Fact which mirrors the movant's statement in matching numbered paragraphs and which set forth a specific reference to the record where the material fact is alleged to arise." The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot,* 00-CV-1178, 2002 WL 368534, at \*2 (N.D.N.Y. March 1, 2002)(interalia citing *Bundy Am. Corp. v. K-Z Rental Leasing, Inc.,* 00-CV-260, 2001 WL 237218, at \*1 (N.D.N.Y. March 9, 2001)).

Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of material facts, the court may grant summary judgment on that basis. *Id.* at 470-71.

In this case, Garrett did not file a response to the motion for summary judgment. Consequently, this court will accept the properly supported facts contained in the defendants' 7.1 Statement (*Dkt. No. 49* ) as true for purposes of this motion.[FN7] With this standard in mind, the court now turns to the sufficiency of Garrett's claims.

> [FN7]. The court notes that this does not apply to the various conclusions of law contained in the defendants' 7.1 Statement.

**B. *Eleventh Amendment***

In Garrett's complaint, he raises claims against the defendants in their official and individual capacity. The Eleventh Amendment provides that: "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. Although the Amendment does not specifically prohibit suits against a state by its own citizens, the Supreme Court has consistently applied that immunity to such cases. *See Burnette v. Carothers,* 192 F.3d 52, 57 (2d Cir.1999)(citing *Edelman v. Jordan,* 415 U.S. 651, 662-63 (1974)). Moreover, it is well established that Eleventh Amendment immunity applies not only when a state is a named defendant, but when liability must be paid from state coffers. *See New York City Health & Hosp. Corp. v. Perales,* 50 F.3d 129, 134 (2d Cir.1995)(citing *Edelman,* 415 U .S. at 665); *Dawkins v. State of New York,* 93-CV-1298, 1996 WL 156764, at \*2 (N.D.N.Y. Mar. 28, 1996).

**\*4** In this case, Garrett raises claims against the defendants in their official and individual capacities. Since the Eleventh Amendment bars official capacity claims against these state officers, this court recommends dismissal of Garrett's claims against the defendants in their official capacity.

**C. *Retaliation***

In this case, Garrett claims that during the course of his appointment as an IGRC representative, he has been subjected to repeated acts of harassment, both verbal and

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

physical, threatened with physical assaults, placed into disciplinary confinement in the SHU, and transferred.[FN8] The Second Circuit has held that retaliation against a prisoner for pursuing a grievance is actionable under § 1983. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Moreover, the Second Circuit has recognized both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated. Thus, prisoners' claims of retaliation are examined with skepticism and particular care. *See Flaherty v. Coughlin,* 713 F.2d 10 (2d Cir.1983).

> FN8. This case turns on the interpretation of the complaint. Garret's complaint is not a model of clarity and as noted, he has failed to file a response to the motion for summary judgment. Nonetheless, a careful reading of Garrett's opening paragraph under the title "Facts" compels this court to interpret this complaint as one claiming retaliation for his activities and status as an IGRC representative.

In order for a plaintiff to prevail on a First Amendment retaliation claim, a plaintiff must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and, (3) that there was a causal connection between the protected speech and the adverse action. *See Dawes v. Walker,*[FN9] 239 F.3d 489, 492 (2d Cir.2001) (citation omitted) *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). If Garret makes these showings, DOCS may evade liability if it demonstrates that it would have disciplined or transferred him " 'even in the absence of the protected conduct." ' *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted).

> FN9. Dawes' complaint was dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

An inmate has a constitutional right to be protected from retaliation based upon his activities as an IGRC representative. *Alnutt v. Cleary,* 913 F.Supp. 160, 170 (W.D.N.Y.1996). However, a claim brought under "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp 2d 113, 129 (N.D.N.Y.2003)(citing *Alnutt,* 913 F.Supp at 165-66)). Ordinarily, a claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Moreover, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Aziz Zarif Shabazz,* 994 F.Supp. at 474.

In this case, Garrett claims that defendant Centore harassed him for his activities as an IGRC representative. Garrett also claims that he was removed as an IGRC representative when he was transferred. In addition, Garrett claims that defendants Reynolds, Mance, Burger and Maher failed to properly investigate his allegations against Centore. Garrett claims that these defendants failed to properly investigate his claims in retaliation for his activities as an IGRC representative.

**\*5** More specifically, Garrett claims that Reynolds and Mance recalled IGRC passes for one day in order to interfere with an investigation inquiry into a correctional officer's conduct involving inmates who were left in the yard during inclement weather. Finally, Garrett claims that his property was destroyed while he was in the SHU.[FN10] Garrett filed grievances against Centore in April, May, and June of 2000. One of his complaints involved Centore throwing a folded piece of paper into his cell which had a picture of a plunger with the words "always gets the job done" on it. On June 23, 2000, he was placed in administrative segregation in the SHU. Three weeks later he was transferred.[FN11]

> FN10. However, the defendants provide the court with documents which show that he was paid $75.00 in settlement of this claim.

> FN11. The defendants maintain that Garrett failed to exhaust this claim. At this juncture, it is unclear whether or not he exhausted this claim. As such, this court cannot, as a matter of law, recommend dismissal because the court has insufficient information to determine this issue.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Viewing the facts in the light most favorable to Garrett, the non-moving party, this court cannot, as a matter of law, find that Garrett fails to state a claim for which relief can be granted. He claims that he was retaliated against for his activities as an IGRC representative. As noted, verbal harassment alone will not constitute a violation of a prisoner's constitutional rights but in this case, it appears that he was transferred for his activities as an IGRC representative. The defendants rely on numerous grievances which were denied by the CORC to show that their actions were proper. They also claim that Garrett has failed to show injury, however, at this juncture of the litigation with virtually no discovery in this case, this court cannot recommend dismissal as a matter of law.

D. *Personal Involvement*

It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)(*citation omitted* ). Since there is no respondeat superior liability, the defendant must be shown to have personal involvement in the alleged deprivation of rights. *Al- Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). Supervisory officials cannot be held liable under § 1983 solely for the acts of their subordinates. *See Monell v. Department of Social Serv.,* 436 U.S. 658, 690-695 (2d Cir.1978). However, a supervisory official can be held liable for constitutional violations if he or she: (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Garrett contends that defendants Reynolds and Mance allowed staff members under their supervision to violate his rights. More specifically, Mance refused to properly investigate Garrett's complaints. Garrett also claims that defendant Burge refused to grant his request for redress against defendant Centore. Finally, Garrett claims that the defendants collectively failed to properly train and supervise their employees.

**\*6** The defendants contend that the claims against the supervisory defendants should be dismissed for lack of personal involvement. However, this court finds this contention without merit since it appears that all of the defendants were involved in the investigation process of Garrett's complaint and he accuses all of them of continuing the alleged constitutional violation by failing to properly investigate the grievances he filed. Accordingly, this court recommends denying the defendants' motion for summary judgment based on the lack of personal involvement.

WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that Garrett's claims against the defendants in their official capacity under the Eleventh Amendment should be dismissed since these claims are barred; and it is further

RECOMMENDED, that defendant O'Reilly be dismissed since he was never served; and it is further

RECOMMENDED, that the defendants' motion for summary judgment be denied in all other respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2003.

Garrett v. Reynolds
Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

101 F.3d 687
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing in
the Federal Reporter. See Federal Rule of Appellate
Procedure 32.1 and this court's local Rule 32.1.1. for
rules regarding the citation of unpublished opinions.)
United States Court of Appeals, Second Circuit.

Howard AYERS, Plaintiff-Appellant,
v.
Sergeant Paul STEWART and Captain
David Stark, Defendants-Appellees.

No. 96-2013.
|
June 25, 1996.

Appeal from the United States District Court for the
Western District of New York.

**Attorneys and Law Firms**

Howard Ayers, pro se, Attica, NY, for appellant.

Troy Oechsner, Assistant Attorney General, of counsel, of
the State of New York, for appellees.

**Synopsis**
W.D.N.Y.

AFFIRMED.

Before OAKES, ALTIMARI, and WALKER, Jr., Circuit
Judges.

**Opinion**
 *1  This cause came on to be heard on the transcript
of record from the United States District Court for the
Western District of New York (Telesca, *Judge* ), and was
submitted.

ON CONSIDERATION WHEREOF, IT IS HEREBY
ORDERED, ADJUDGED AND DECREED that the
judgment of said district court be and it hereby is
AFFIRMED.

Plaintiff-appellant Howard Ayers, who is proceeding *pro
se* and *in forma pauperis,* appeals from a November 29,
1995 judgment of the district court granting summary
judgment to the defendants pursuant to Fed.R.Civ.P.
56(c).

On November 22, 1993, Ayers filed a *pro se* complaint,
pursuant to 42 U.S.C. § 1983, against Sergeant
Paul Stewart and Captain David Stark of Elmira
Correctional Facility, alleging that (1) Stewart filed a
false administrative segregation recommendation against
Ayers in retaliation for Ayers having filed a prison
grievance against Stewart; (2) Stark violated Ayers's
procedural due process rights while acting as a hearing
officer for the administrative hearing, which resulted in
Ayers being placed in administrative confinement; and (3)
Stewart violated Ayers's due process rights by confiscating
papers from Ayers's cell.

We review the district court's grant of summary judgment
de novo to determine whether a genuine issue of material
fact exists. *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.),
*cert. denied,* 502 U.S. 849 (1991). We draw all inferences
in the light most favorable to the nonmoving party.
*Gallo v. Prudential Residential Servs. Ltd. Partnership,*
22 F.3d 1219, 1223 (2d Cir.1994). Reviewing a claim of
retaliation by an inmate, however, mandates skepticism
and particular care, because of the ease with which such
a claim can be fabricated. *Colon v. Coughlin,* 58 F.3d 865,
872 (2d Cir.1995).

Ayers' allegation that a meeting had transpired among
the defendants, during which they allegedly agreed to
confine Ayers, is conclusory and is totally unsupported by
the record. As such, it cannot defeat summary judgment.
*See Finnegan v. Board of Educ.,* 30 F.3d 273, 274 (2d
Cir.1994) (conclusory allegations insufficient to survive
summary judgment motion on retaliation claim). Given
the weakness of his retaliation claim, Ayers' reliance
on circumstantial evidence of retaliation-namely, the
proximity of the disciplinary action to his complaint where
no misbehavior reports were previously filed against him-
does not suffice to defeat summary judgment. *See Colon,*
58 F.3d at 873 ("If ... circumstantial evidence represented
the sum total of [plaintiff's] proof, we might be inclined
to affirm the grant of summary judgment based on
the weakness of [plaintiff's] case."); *see also Flaherty v.
Coughlin,* 713 F.2d 10, 13-14 (2d Cir.1983).

1996 WL 346049

Although we have been reluctant to affirm summary judgment in cases where the party opposing the motion was not allowed to conduct discovery, *see, e.g., Flaherty, 713 F.2d at 13,* Ayers was given ample opportunity. Ayers conducted discovery and received five separate answers to interrogatories from Stewart. Despite his use of discovery mechanisms, Ayers is unable to ascertain information that would substantiate his claims. Although Ayers has attached two new affidavits to his brief on appeal to substantiate his claim that Stewart tried to coerce inmates to testify against him in the administrative segregation hearing, this evidence was not before the district court and we therefore do not consider it. Consequently, the district court properly granted the defendants' motion for summary judgment.

 **\*2** Finally, the district court properly concluded that Ayers failed to establish the necessity of further discovery pursuant to Fed.R.Civ.P. 56(f). In order to oppose a motion on the basis of Rule 56(b), the plaintiff must file an affidavit detailing: (1) what facts are sought and how they are to be obtained; (2) how those facts are reasonably expected to create a genuine issue of material fact; (3) what efforts the affiant has made to obtain those facts; and (4) why these efforts were unsuccessful. Ayers's general assertion that he needed more discovery does not meet these requirements, for Ayers fails to state what additional information he needs or how it will create a genuine issue of material fact.

We have considered the plaintiff's remaining contentions and affirm substantially for the reasons stated by the district court. For the reasons set forth above, the judgment of the district court is hereby AFFIRMED.

**All Citations**

101 F.3d 687, 1996 WL 346049 (Table)

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 1007780
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Gary ETHIER, Plaintiff,
v.
CITY OF COHOES, New York, James Ward,
Patrick Abrams, and Jeffrey Guzy, Defendants.

No. 1:02-CV-1584.
|
April 18, 2006.

**Attorneys and Law Firms**

David Brickman, Office of David Brickman, Albany, NY, for Plaintiff.

Gregg T. Johnson, Jacinda Hall Conboy, Girvin, Ferlazzo Law Firm, Albany, NY, for Defendants.

***DECISION and ORDER***

THOMAS J. McAVOY, Senior United States District Judge.

**\*1** Plaintiff Gary Ethier commenced the instant action against Defendants claiming violations of his civil rights in connection with his employment as a police officer for the City of Cohoes, New York. Presently before the Court is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 seeking dismissal of the Complaint in its entirety.

## I. FACTS

Plaintiff was a police officer with the City of Cohoes, New York. During his first few years with the Cohoes Police Department ("CPD") (1991-1993), Plaintiff was trained and/or supervised by Defendants James Ward ("Ward") and Patrick Abrams ("Abrams"). On August 21, 1995, Plaintiff drove his police vehicle onto a curb and sidewalk, nearly striking a pedestrian with the vehicle. As a result of this incident, Plaintiff was the subject of an internal investigation by the CPD. Plaintiff ultimately pleaded guilty to violating Cohoes Police Department General Order 0012-95 entitled "Rules of Conduct" and agreed to undergo a psychological evaluation, undertake remedial

instruction on the operation of a police vehicle, and take any tests deemed necessary by the psychologist.

On February 24, 1997, Plaintiff arrested Patrick O'Donnell. After the arrest, but before Plaintiff transported O'Donnell to the police station, O'Donnell suffered injuries to his head and face. There also was damage to the rear window of a police vehicle. As a result of this incident, Plaintiff was the subject of an internal investigation.

On January 8, 1998, while Plaintiff was in pursuit of Richard Maynard, Mr. Maynard's body struck the ground and/or a retaining wall on multiple occasions before Plaintiff placed Maynard under arrest, causing Maynard to suffer injury to his face. As a result of this incident, Plaintiff was the subject of an internal investigation. This investigation resulted in Plaintiff's pleading guilty in April 1998 to violating Cohoes Police Department General Order 92-5 ("Off Duty Arrests"). As a result of this guilty plea, Plaintiff agreed that he would receive a letter of reprimand and thirty day suspension without pay, which suspension was to be held in abeyance for one year unless Plaintiff was found guilty of violating Cohoes Police Department General Order 92-5 or 0019-48 ("Physical Force") as a result of the January 8, 1998 incident involving the arrest of Maynard.

On September 25, 1998, Plaintiff placed John Gaston upon or against a police vehicle while attempting to arrest him. During the course of the arrest, Gaston suffered injury to his face and body and there was damage to the police vehicle, including a dented fender and cracked windshield. This incident resulted in an internal investigation.

In 1998, there were discussions in the CPD regarding Plaintiff's participation in the D.A.R.E. program with the Cohoes City School District. School District officials advised Defendants that if Plaintiff was permitted to participate in the D.A.R.E. program, the school would drop the program. [1]

**\*2** On February 3, 1999, Plaintiff effected a traffic stop of Eric Sawyer. Plaintiff kicked and struck Sawyer before restraining Sawyer, causing injury to Sawyer's face. This conduct resulted in another internal investigation.

On February 16, 1999, Plaintiff physically restrained Eugene Aquilina and pushed Nicole Brown while attempting to arrest Aquilina. Brown lodged a civil complaint against Plaintiff alleging excessive force and misconduct. This incident also was the subject of an internal investigation.

On March 5, 1999, Plaintiff physically restrained and maced Kyle Durocher while attempting to arrest him. Durocher filed a civil complaint against Plaintiff alleging excessive force and misconduct. This incident was the subject of an internal investigation.

On March 12, 1999, Plaintiff stopped a vehicle suspected of violating the New York State Vehicle and Traffic Law. According to Plaintiff, he smelled alcohol and believed the driver to be driving under the influence of alcohol. The driver of the vehicle was Defendant City of Cohoes Corporate Counsel, John Doherty. Plaintiff contends that he administered sobriety tests and an alco-sensor test to Doherty, all of which he failed. Plaintiff further contends that Sergeant Kubik, who was at the scene, spoke with Defendant Ward who advised that Plaintiff was to bring Doherty to the police station where he was to be released to someone who had not been drinking. When Plaintiff returned to the police station with Doherty, a taxi was called for Doherty and he was released. Plaintiff was neither reprimanded nor charged with respect to his conduct on March 12, 1999.

On March 17, 1999, Plaintiff was involved in a heated verbal exchange with CPD Detective Thomas Ross and his spouse at Mac's Tavern and Restaurant. By memorandum dated March 26, 1999, Plaintiff was advised that an internal investigation was being conducted with respect to the March 17 incident.

A meeting was conducted with CPD Chief Heslin, Defendant Ward, Lieutenant Ross, and Plaintiff concerning the March 17, 1999 incident. During the meeting, Plaintiff made a remark concerning Ross' wife, after which Ward ended the meeting and escorted Plaintiff out of the CPD.[2]

On or about March 22, 1999, Ward assigned Plaintiff to formal training. The formal training consisted of Plaintiff's being assigned to Sergeant Kubik when Kubik was working. When Kubik was not working, Plaintiff was to perform inside duties and not leave the police station without a supervisor. Plaintiff also was prohibited from assuming the duties of a tour supervisor. It was also ordered that Plaintiff would not be counted as manpower so, if the need arose, the CPD may have to call for overtime.

In April 1999, Plaintiff was directed to submit to a mental health evaluation. On April 22, 1999, Kubik prepared a memorandum indicating that Plaintiff had met the training objectives set forth on March 22, 1999. On April 28, 1999, Plaintiff was assigned to a two-man unit. Plaintiff continued to be prohibited from acting as a tour supervisor.

**\*3** On October 20, 1999, Plaintiff returned to unrestricted duty. Plaintiff consented to the withdrawal of all contractual grievances he and/or his union filed on his behalf between March 17, 1999 and October 20, 1999. On November 14, 1999, Plaintiff violated CPD Order 0057-95 by leaving his post without proper notification.

On March 24, 2000, Plaintiff entered a dwelling occupied by Hani Khalil. Plaintiff used physical force to arrest Khalil. Khalil lodged complaints against Plaintiff alleging an unlawful search, the use of excessive force, and misconduct. This resulted in an internal investigation.

On May 8, 2000, Plaintiff was issued a Notice of Discipline. Plaintiff requested an arbitration hearing concerning the Notice of Discipline. Following a full evidentiary hearing at which Plaintiff was represented by counsel, the arbitrator found Plaintiff guilty of various charges against him. Plaintiff was found guilty of violating CPD Order 12-95 (Rules of Conduct), 19-94 (Use of Force), 15-95 (Prisoners Detained in Cellblock),[3] 57-95 (Patrol Zones), and 98-95 (Constitutional Guarantees). In all, Plaintiff was found guilty of eight out of twenty-one charges. The arbitrator imposed a penalty of two months suspension without pay. There was no appeal of the arbitrator's decision.

On May 18, 2001, Plaintiff was again charged with misconduct. It was alleged that Plaintiff gave false testimony. Specifically, there was an allegation that Plaintiff was present during the arrest of a Bret Woodworth, who claimed that the CPD used excessive force against him. At Woodworth's trial, Plaintiff denied remembering arresting Woodworth. Defendant Guzy, on the other hand, testified that Plaintiff was present during the

arrest, raising a conflicting account of the incident. It was Plaintiff's position that he was outside during the arrest and, therefore, not present. At a subsequent administrative hearing, Guzy admitted that Plaintiff was not, in fact, involved in Woodworth's arrest. Defendants sought to terminate Plaintiff's employment if he was found guilty of the charges. These charges resulted in no guilty findings and Plaintiff was reinstated with all of his pay and benefits.

Plaintiff's police vehicle sustained damage on January 23, 2003. Plaintiff failed to timely report this damage. This was the subject of an internal investigation. On March 18, 2003, Plaintiff accepted the finding that he violated the CPD rules for failure to report damage to his vehicle. Plaintiff also accepted the disciplinary action of two week suspension without pay and forfeiture of two weeks accrued vacation.

Effective April 20, 2003, Plaintiff was appointed to a position of police officer with the Rennselaer Police Department. On April 21, 2003, Plaintiff voluntarily signed a letter of resignation and sent it to the CPD.

Based on the foregoing, Plaintiff commenced the instant action pursuant to 42 U.S.C. § 1983 alleging violations of his First, Fifth, and Fourteenth Amendment rights. Defendants now move to dismiss the Complaint in its entirety.

## II. STANDARD OF REVIEW

**\*4** It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, *see Tenenbaum v. Williams,* 193 F.3d 581, 592 (2d Cir.1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). A party seeking summary judgment bears the burden of informing the Court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

If the movant is able to establish a basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in his favor. *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002). However, a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994), or on conclusory allegations or unsubstantiated speculation. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d. Cir.1998). With this standard in mind, the Court will address Defendants' motion.

## III. DISCUSSION

### a. *Due Process*
Defendants move to dismiss the "stigma plus" due process claims on the grounds that: (1) Plaintiff's employment was not terminated and, thus, he was not deprived of a property interest; and (2) he was afforded due process of law with respect to the charges against him. Plaintiff has failed to respond to this portion of Defendants' motion, thereby indicating his consent to the dismissal of this claim. *See* N.D.N.Y.L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its entitlement to the relief requested therein, the non-moving party's failure to file or service any papers as this Rule requires shall be deemed as consent to the granting ... of the motion.")

With respect to the charges filed against Plaintiff, the uncontroverted evidence is that he was afforded all process due. Specifically, Plaintiff was given notice of the charges against him and was afforded the opportunity of a full pre-deprivation hearing at which time he could be represented by counsel, presented with the evidence against him, and present his own evidence. In several instances Plaintiff did not avail himself of this opportunity, *see* Def.'s Rule 7.1(a)(3) stmnt. at ¶¶ 33, 66, thereby waiving his due process claims. *Morrisroe v. Safir,* 1998 WL 709822, at \*2 (S.D.N.Y.1998). In another instance, a full hearing was held at which several charges were upheld against Plaintiff. *Id.* at ¶¶ 42, 44, 52. Plaintiff

declined to appeal the decision. *Id.* at ¶ 54. Plaintiff again invoked this procedure with respect to the perjury charges. After a full hearing, Plaintiff was acquitted of the charges. *Id.* at ¶¶ 62, 63, 64. It is, thus, evident that Plaintiff was afforded all process that was due. *See Patterson v. City of Utica,* 370 F.3d 322, 329 (2d Cir.2004).

**\*5** To the extent Plaintiff asserts a stigma-plus claim, that claim, too, must fail. "A person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause or create a cause of action under § 1983.... Loss of one's reputation can, however, invoke the protections of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest, such as government employment." *Id.* at 329.

Here, Plaintiff fails to identify any such tangible interest. Plaintiff was not terminated from his employment with the CPD. Plaintiff does not point to any other actions undertaken by Defendant that amount to a loss of a sufficient tangible interest to sustain a stigma-plus claim. Assuming Plaintiff can identify other tangible interests, he fails to point to any false statements made public by Defendants for which he was not afforded a name clearing hearing. Although Plaintiff was the subject of several charges that resulted in his being suspended without pay for sixty days, Plaintiff was afforded a full hearing after which he was found not guilty of some of the charges against him and found guilty on eight of the charges. With respect to other charges or disciplinary actions against Plaintiff, he either withdrew his grievances or consented to the findings against him. *See.* Def's Rule 7.1(a)(3) stmnt. at ¶¶ 10, 33, 66. Thus, any employment decisions (such as his suspension) were based on charges found to be true and for which he was afforded the opportunity of a hearing. With respect to the perjury allegations, Plaintiff was afforded a full administrative hearing and exonerated of the charges. No employment action was taken against him on account of any alleged perjury. Accordingly, Plaintiff's due process claims must be dismissed. *Id.*

### b. First Amendment

Plaintiff also claims that he was retaliated against for engaging in protected speech. Plaintiff contends that his desire to arrest Corporation Counsel Doherty constituted speech on a matter of public concern and that Defendants retaliated against Plaintiff for engaging in

such protected speech. Although Plaintiff cites many cases for the proposition that speech directed at the integrity of government entities constitutes protected speech (a proposition with which this Court does not disagree), the fundamental problem with Plaintiff's claim is there is no evidence that he engaged in protected speech or that Defendants were aware of any such speech.

While the determination of whether speech is protected "may be somewhat fact-intensive, it presents a question of law for the court to resolve." *Johnson v. Ganim,* 342 F.3d 105, 112 (2d Cir.2003). Whether speech is protected depends on its context, form and content. *Connick v. Myers,* 461 U.S. 138, 147-48 (1983). Speech by a public employee is on a matter of public concern, and protected by the First Amendment, if it relates "to any matter of political, social, or other concern to the community." *Id.* at 146. "However, speech that relates primarily to matters of personal interest or internal office affairs, in which the individual speaks as an employee rather than as a citizen, will not support a First Amendment retaliation claim." *Kelly v. City of Mount Vernon,* 344 F.Supp.2d 395, 402 (S.D.N.Y.2004). Speech that arises in the usual course of a public official's duties is generally not protected. *See Cahill v. O'Donnell,* 75 F.Supp.2d 264, 273 (S.D .N.Y.1999)("A communication by an employee to an employer in the course of the employee's normal duties, in routine form, and containing standard contents, is not likely to address a matter of public concern."). Speech about individual or isolated problems within a police department, or one of its officers, are not matters of public concern. *Cahill,* 75 F.Supp.2d at 272 (internal office affairs are not matters of public concern.). As the Supreme Court has stated: "To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark-and certainly every criticism directed at a public official-would plant the seed of a constitutional case." *Connick,* 461 U.S. at 147-49. On the other hand, a claim of systemic or endemic problems in a public department might rise to the level of protected public speech. *See Collins v. Christopher,* 48 F.Supp.2d 397, 408 (S.D.N.Y.1999)(collecting cases),

**\*6** The uncontroverted evidence before the Court is that on March 12, 1999, Plaintiff pulled over a car that was being driven by Corporation Counsel Doherty. Plaintiff smelled alcohol emanating from the driver and, therefore, instructed the driver to exit the vehicle to perform sobriety tests. According to Plaintiff, Doherty failed the tests.

Based upon Sergeant Kubiks' direction (Kubik having received orders from Defendant Abrams), Plaintiff did not arrest Doherty and, instead, drove him to the police station where he was then released. There is no evidence in the record that Plaintiff expressed his desire to arrest Doherty, that he disagreed with Abrams's order not to arrest Doherty, that Plaintiff otherwise spoke out on the issue of letting Doherty go, that Plaintiff was raising concern about the covering up of the criminal acts of political figures, or was otherwise raising concern about endemic issues within the police department. The mere acts of performing his duties as a police officer by pulling Doherty over, administering sobriety tests, taking him to the police station, and letting him go were all within the course of Plaintiff's employment as a police officer and, therefore, not protected speech. *See Kelly,* 344 F.Supp.2d at 403 (finding that a police officer's investigations into illegal firearms which involved the mayor's son and the child of another police officer were not protected speech because they arose during a normal police investigation).

In support of his claim, Plaintiff cites to his Exhibit B which is a memorandum dated March 16, 1999 written from Plaintiff to Ward. That memorandum, however, does not evidence Plaintiff's having engaged in protected speech. A review of the memorandum reveals that it is Plaintiff's fact based recount to Abrams of the events of March 12, 1999. Nowhere in that memorandum does Plaintiff indicate that he wanted to arrest Doherty, that he thought Doherty should be arrested, that he disagreed with the decision to let Doherty go, that he was complaining about pervasive problems within the police department, or that he was discussing any problem within the CPD. In his memorandum of law, Plaintiff contends that he insisted that Doherty be arrested. Plaintiff points to no evidence to back this up.[4] Plaintiff does not even submit an affidavit stating that he intended his memorandum to be a report of wrongdoing within the CPD or to otherwise constitute speech on a matter of public concern. *See Morris v. Crow,* 142 F.3d 1379, 1382 (11th Cir.1998) ("Not only must the speech be related to matters of public interest, but the purpose of the expression must be to present such issues as matters of 'public' concern.") (holding that a police report prepared by a police officer concerning his investigation into a traffic accident did not constitute protected speech).[5]

Even if Plaintiff subjectively believed that he was engaging in protected speech, Abrams would not reasonably have understood Plaintiff's memorandum as complaining about government integrity or concealing the drunk driving of a political figure. There is no indication that there was endemic problems concerning the covering up by the CPD of the criminal activities by politicians or other systemic problems in the CPD. The only reasonable conclusion is that Plaintiff was speaking as a public employee and not as a public citizen. Accordingly, the Court finds that Plaintiff did not engage in protected speech. Plaintiff's First Amendment claims must, therefore, be dismissed.

**\*7** Even assuming, *arguendo,* that Plaintiff did engage in protected speech, there is insufficient evidence of a nexus between any such speech and any alleged adverse employment action. The Court recognizes the close temporal proximity between the March 12, 1999 arrest of Doherty and Plaintiff's being subjected to a change in his work duties commencing on March 22, 1999. The Court further recognizes that a close temporal relationship between the protected activity and the adverse employment action can give rise to an inference of causation. In this case, however, to hold that the temporal relationship is sufficient would be to ignore the overwhelming uncontroverted evidence of Plaintiff's misconduct leading up to the March 26, 1999 letter changing Plaintiff's duties (the "March 26 letter") and the lack of any evidence tending to suggest that the Doherty incident had anything to do with Plaintiff's discipline. *See Simpson v. New York State Dept. of Civil Services,* 2006 WL 93011 (2d Cir. Jan. 9, 2006) ("While the temporal proximity of these events gives rise to an inference of retaliation for the purposes of appellant's prima facie case, without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext.") (citing *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 770 (2d Cir.1998) for the proposition that a "strong temporal connection between the plaintiff's complaint *and* other circumstantial evidence is sufficient to raise an issue with respect to pretext.") (emphasis in original); *Colon v. Coughlin,* 58 F.3d at 872-873; *Ayers v. Stewart,* 101 F.3d 687, 1996 WL 346049, at \*1 (2d Cir.1996) (unreported decision); *Richter v. Monroe County Dept. of Social Serv.,* No. 01 Civ. 6409, 2005 WL 351052, at \*14 (W.D.N.Y. Feb. 11, 2005) ("Temporal proximity alone is insufficient to carry plaintiff's burden of proof beyond the prima facie stage, and nothing she has submitted shows that she will be able to persuade a fact-finder that the retaliation played a part in her

termination."); *Ziemba v. Thomas,* 390 F.Supp.2d 136, 157 (D.Conn.2005).

It is undisputed that Plaintiff had a lengthy history of misconduct, including the use of excessive force, going back to at least as far as 1995. In the first three months of 1999 alone, he was the subject of three complaints of the excessive use of force-one on February 3, 1999, another on February 16, 1999, and another on March 5, 1999. On March 17, 1999, after the March 12 Doherty incident involving Doherty and before the issuance of the March 26 letter, Plaintiff admits he was involved in a heated exchange with Detective Ross and his spouse. There is further evidence that, during a meeting later that day, Plaintiff insulted Detective Ross's wife, which caused Ward to end the meeting and escort Plaintiff out of the police station. On March 26, 1999, Plaintiff was ordered to undergo additional training, to be supervised by Kubik, and disqualified from being a tour supervisor.

 **\*8** This history of misconduct gave Defendants ample reason to require Plaintiff to undergo additional training and to require that Plaintiff be under the supervision of Kubik. Moreover, the terms of the March 26 letter clearly relate to Plaintiff's prior incidents of misconduct. Part of that training included reviewing with Plaintiff department policies on the rules of conduct and the use of force. Directive 1 and 3 of the March 26 letter obviously related to the incident between Plaintiff and Detective Ross. Specifically, those directives prohibited Plaintiff from entering the restaurant at which the incident occurred, prohibited Plaintiff from communicating with persons involved in the incident, and required Plaintiff to report any contact with any persons involved in the incident. Nothing about the March 26 letter tends to suggest that it was issued on account of the March 12 incident involving Doherty. Other than the previously discussed memorandum from Plaintiff to Ward, there is no evidence in the record that Plaintiff ever spoke to Ward or anybody else about the Doherty incident, or that any of the Defendants discussed the Doherty incident with Plaintiff or amongst themselves. In fact, Plaintiff specifically admitted that he never received a written reprimand concerning his conduct on March 12, 1999, nor did Plaintiff receive any disciplinary charges which referred to his conduct on March 12, 1999. Def.'s Rule 7.1(a)(3) stmnt. at ¶ 25. It, therefore, cannot be said that a fair minded trier of fact could reasonably conclude that the March 12 Doherty incident was a motivating factor in the March 26, 1999 change in Plaintiff's duties.

On March 15, 1999, Plaintiff made a request to Abrams to switch one of his days with Abrams. Abrams is purported to have responded "start acting like a cop and I'll treat you like one." Even assuming Abrams' refusal to switch days with Plaintiff was on account of protected speech, the refusal to switch a day of work is not an adverse employment action. Moreover, the evidence before the Court is that, although Abrams initially denied Plaintiff's request, he ultimately granted it.

Further, any claim that the March 12, 1999 incident caused the March 26, 1999 change in duties is time-barred. Plaintiff's Complaint was filed on December 23, 2002, which is more than three years after Plaintiff was returned to full active duty in October 1999 and long after the issuance of the March 26, 1999 letter. The same reasoning would apply to any other claimed adverse employment actions that occurred prior to December 23, 1999, including Plaintiff's claim that he was illegally subjected to a mental health evaluation in March 1999, or that his request to switch certain days off was denied. These allegations are time-barred.

With respect to any other alleged employment actions identified by Plaintiff (a verbal counseling in March 2000, the March 2000 investigation into the Khalil incident, and any subsequent incidents), they all occurred long after the March 12, 1999 and, thus, no inferences of causation may be drawn between the timing of the March 12, 1999 Doherty incident and these other alleged adverse employment actions. Plaintiff has failed to point to sufficient other circumstantial evidence from which a fair-minded trier of fact could reasonably conclude that these other incidents in 2000 and later were on account of the March 12, 1999 Doherty incident.[6] Defendants did not take any employment actions against Plaintiff except as imposed by an independent arbitrator and/or as consented to by Plaintiff. Accordingly, no fair-minded trier of fact could reasonably conclude that Plaintiff was subjected to adverse employment action on account of the March 12, 1999 Doherty incident.

## IV. CONCLUSION

 **\*9** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN ITS ENTIRETY.

Plaintiff's Complaint is DISMISSED. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1007780

Footnotes

1    Although Plaintiff denies this allegation, he fails to point to any record evidence tending to suggest that it is not true. Accordingly, this fact is deemed admitted. N.D.N.Y.L.R. 7.1(a)(3).

2    Plaintiff denied this assertion, which is contained in Defendant's N.D.N.Y.L.R. 7.1(a)(3) statement of material facts. The denial is not supported by a citation to the record as required by that rule. Accordingly, Defendants' assertion (and all other assertions to which Plaintiff asserted a blanket denial with no citation to the record) is deemed admitted. *See* n. 1 *supra.*

3    Plaintiff required Khalil to remove his pants while in the cell block without any reason to believe that such action was necessary.

4    The Court declines to scour the record in an attempt to find triable issues of fact. *See Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002)("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (citations omitted)

5    Moreover, there is evidence suggesting that Plaintiff's actions were motivated purely by his own personal self-interest. It appears that, at the time of the March 12 incident, Plaintiff was seeking to have a clause inserted into the relevant collective bargaining agreement ("CBA") whereby the municipality would indemnify officers for punitive damages awarded against them. Doherty opposed having such a clause in the CBA. There is testimony that Plaintiff had expressed a desire to "get back" at Doherty for his position on the issue.

6    Plaintiff alleges that Sergeant Meeker stated "But it's Gary Ethier, and when it comes to Gary Ethier you know that there is special circumstances that we have to follow." This statement attributed to Sergeant Meeker does not come from an affidavit of Sergeant Meeker or deposition testimony from Sergeant Meeker. In fact, Plaintiff claims this statement to have made, but provides no citation in the record to support it. This statement is hearsay and will not be considered in connection with the pending motion.

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.



Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

H

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Maurice SAMUELS, Plaintiff,
v.
Donald SELSKY, Glenn Goord, Paul Cecilia, Javier Iurrue, G. Schwartzman, Dennis Bliden, Jeffery McCoy, and Christopher P. Artuz, Defendants.
No. 01CIV.8235(AGS).

Sept. 12, 2002.

OPINION & ORDER

SCHWARTZ, District J.

I. Introduction

**\*1** Maurice Samuels alleges that while incarcerated at the Green Haven Correctional Facility,[FN1] prison officials searched his cell and confiscated a number of documents which were deemed to be "subversive" and contraband. Samuels claims that the materials, including theological textbook excerpts, were of a Christian nature and were used in a course he taught in the prison through the New York Theological Seminary. Samuels' alleged possession of these documents led to a misbehavior report and a subsequent disciplinary hearing, for which Samuels was sentenced to 180 days in keeplock and 180 days' loss of packages, commissary privileges, and telephone use. Samuels also alleges that instead of being punished as per his disciplinary hearing, he was sentenced to a more severe punishment, 180 days in a special housing unit which entailed Samuels' being locked in his cell for twenty-three hours per day. On the basis of the allegedly unlawful sanctions to which he was subjected, Samuels has filed the instant action pursuant to 42 U.S.C. § 1983 alleging violations of, *inter alia*, his First Amendment and due process rights, and seeks equitable relief and damages.

Defendants have filed a motion to dismiss the action pursuant to FED. R. CIV. P. 12(b)(1) and (6), and argue that they enjoy qualified immunity barring this suit. For the reasons set forth below, defendants' motion is granted in part and denied in part.

FN1. Defendants repeatedly state that the events giving rise to this action arose while Samuels was incarcerated at the Great Meadow Correctional Facility. Samuels states that the events in question happened at the Green Haven Correctional Facility. Moreover, Samuels' evidence, including the Inmate Disciplinary Report (Exhibit H), the Disciplinary Hearing Record Sheet (Exhibit O), and the Superintendent Hearing Disposition Report (Exhibit P) all note the Green Haven Correctional Facility. In light of the above, the Court determines that defendants' position that the events occurred at Great Meadow is incorrect. The Green Haven Correctional Facility is located in Dutchess County in the Southern District, while Great Meadow is located in Washington County in the Northern District. Defendants make no argument regarding the Court's jurisdiction with respect to the location of the events in question.

II. Factual Background [FN2]

FN2. Unless otherwise indicated, the facts set forth below are gleaned from Samuels' submissions, because on a FED. R. CIV. P. 12(b)(1) or (6) motion, the adjudicating court must assume as true factual allegations made in the complaint. Defendants concede this fact. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint, at 4. It should also be noted that Samuels brings this action *pro se.* As such, it is sometimes difficult to understand fully his contentions. Accordingly, the Court reads the (sometimes confusing) factual allegations in the light most favorable to Samuels.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Maurice Samuels is currently an inmate at the Sullivan Correctional Facility. Since being incarcerated, Samuels has taken a keen interest in religion. He identifies himself as a member of the Five Percent Nation of Gods and Earths. [FN3] While confined at Sing Sing, he received a degree of Master of Professional Studies in Prison Ministry through the New York Theological Seminary ("NYTS"). *See* Complaint Pursuant to U.S.C.A. Section 1983 ("Complaint"), at 4; Exhibit ("Ex.") A. Upon completion of his studies with the NYTS, Samuels was transferred to the Green Haven Correctional Facility. [FN4] At Green Haven, Samuels was assigned a clerk's position in therapeutic "Reality and Pain Program." He subsequently redesigned the program, creating the "Reality and Pain Therapeutic Counseling Program." *See* Complaint, at 4. During this period he also served as a volunteer inmate instructor in the Black Studies program, and was later assigned as a clerk in Green Haven's Senior Counselor's Office, where he helped create a program for sex offenders. *See id.* at 4.

FN3. The website of the University of Chicago's Divinity School provides a good summary of the beliefs of the adherents of the Five Percent Nation of Gods and Earths, commonly known as the "Five Percenters." *See* Jonathan Moore, *The Five Percenters: Racist Prison Gang or Persecuted Religion?,* SIGHTINGS, May 21, 1999, *available at* http://divinity.uchicago.edu/sightings/archive_1999/sightings-052199.html. The name of the group stems from its belief that only five percent of people are aware of and teach the truth. The term "Gods" refers to black male members; "Earths" refer to black female members. The group was founded by Clarence 13X, who left the Nation of Islam in 1964. According to Moore, "[m]any of the theological accoutrements of Black Muslim belief remain: many read the Qur'an and Elijah Muhammad's writings (especially his "Message to the Black Man"), and they hold to the exclusive divinity of black men." *Id.* (The Moore article, not part of the record, is provided for background purposes only). Samuels has included two pages outlining the differences between the Nation of Gods and Earths and similar black Muslim groups-the Nation of Islam and the Temple of Islam. *See* Exhibit B.

FN4. *See supra* note 1.

The NYTS later began a certificate program in Christian Ministry in conjunction with Marist College at Green Haven. Samuels was invited to teach several courses for the program, including a course entitled "World Views and Values" and another entitled "Introduction to Theology and Methods." *See* Complaint, at 4; Ex. E, at 12. Samuels is listed on the "Faculty and Administration" page of the Certificate in Ministry Program brochure. *See* Ex. E, at 10. In designing his theology course, Samuels, in conjunction with Professor Mar Peter-Raoul (currently the Chair of the Department of Philosophy and Religious Studies at Marist College), prepared a syllabus which included the following:

**\*2** a. This is an introductory approach to contemporary Christian Theology, there will be a broad range of material provided for the student so that they [sic] may see the evolution of Christian Theology and Contemporary Theologies, active in the world today.

b. The course is divided into different sessions (1) What is Theology; (2) Philosophy & Theology; (3) Contemporary Theology; (4) Political and Liberation Theology; (5) Feminist/Womanist Theology; and (6) Black & Third World Theology.

c. This is done so that the student can examine the evolution of Christian Theology and Contemporary Theologies, and arrive at the next step in the process, i.e. explore the [sic] how to do theology.

d. This introduction to theology course will be taught from a [sic] interdisciplinary and non-traditional approach.

Complaint, at 5. This syllabus was approved by the appropriate authorities from NYTS, Marist College, and the Department of Corrections ("DOCS"). *See id.* at 5.

The central issue in this case involves a search of Samuels' cell. On September 15, 1999, another member of the Five Percent Nation of Gods and Earths who was involved in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

the NYTS program was disciplined for allegedly possessing a pamphlet entitled "Awake" or "Awaken" which addressed topics such as racism in the criminal justice system and abuses of the Rockefeller drug laws. *See* Complaint, at 6. On October 19, 1999, the assistant inmate director for the NYTS certificate program was interrogated about the program and why some of its members were also members of the Five Percent Nation of Gods and Earths. At the time, Samuels was housed in the inmate honor block housing Unit and taught a pre-G.E.D. and adult basic education class in the morning and afternoon and taught his theology class in the evening. *See* Complaint, at 6. According to defendants, Sergeant Schwartzman, a member of the prison staff, received a report from a confidential informant that Samuels was a leader of a protest planned to occur around January 1, 2000 ("Y2K protest").[FN5] On October 20, 1999, Schwartzman ordered correction officers Williams and Kelly to search Samuels' cell. Samuels states that the confiscated materials included Marist College and NYTS course handouts for the certificate program, previously published material from the NYTS and Marist College, notes from newspaper articles, a manuscript Samuels had been working on since first attending the NYTS, and Kairos statements.[FN6] *See* Complaint, at 7. According to the Cell Search Report, contraband was found which consisted of a "folder of papers containing subversive material." Ex. G. On the same day, an Inmate Misbehavior Report was completed. *See* Ex. H. The rule violations are listed as 104.12 (action detrimental to the order of the facility) and 113.23 (contraband). *See id.* The narrative section of the Inmate Behavior Report states:

> [FN5.] While denying a link to the Y2K protest, Samuels provides some background on the matter. According to Samuels, DOCS created a program at Green Haven through the Corcraft Industry Division Program known as the Recreational Cell Building Project ("Project"). The Project initially used inmate volunteers to build Inmate Recreational Cells at recently constructed S-Facilities (special housing institutions). According to Samuels, because of poor working conditions, low wages, and other factors, inmates increasingly refused to volunteer for the Project and sought other work assignments. Samuels alleges that DOCS personnel then began using the disciplinary process to systematically force inmates to work

in the Project. *See* Complaint, at 3. Samuels also alleges that prison officials specifically targeted members of the NYTS and the Five Percent Nation of Gods and Earths for compelled work participation in the Project. *See id.* at 4. The planned Y2K protest, in which Samuels claims to have played no role, was intended to protest the program as well as prison conditions generally.

> [FN6.] The Kairos Statements (referred to by Samuels as "Karios Statements") are critiques of traditional church dogma. The most famous Kairos statement originated as a critique of alleged church complicity in the white *apartheid* regime in South Africa.

On the above date [10/20/99] and time while conducting a cell search on cell D-1-21 which houses inmate Samuels, Maurice 85A0184 the following contraband was found and recovered;

**\*3** (1) Folder of papers containing subversive material These papers speak about inmate [sic] uniting together to fight against opositions [sic] such as the N.Y. parole system and other dept. of correction [sic] programs.

This material is consistant [sic] with information recieved [sic] that inmate Samuels has been active in urging others to participate in a demonstration on or about Jan. 1, 2000, which led to his cell being searched.

Ex. H. The form is signed by G. Williams, a correction officer, and G. Schwartzman. The documents are not identified, nor is there an explanation of why they were considered "subversive." Samuels repeatedly asked prison authorities to identify the "subversive" documents without success. *See, e.g.,* Exhibits ("Exs.") J, K, M, N, V, 7, 9. Defendants have not furnished the confiscated papers for the Court, and make no representation as to what documents were found in Samuels' cell or why they are considered "subversive." Samuels states that the materials seized by the prison officials is not literature pertaining to the Five Percent Nation of Gods and Earths but Christian ministry materials he used in teaching his class and which had previously been approved by the NYTS and prison

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

authorities. *See* Complaint, at 5. Samuels also states that newspaper clippings and a manuscript he had been working on since 1986 were taken. *See* Affidavit [of Maurice Samuels] in Support of Opposition Motion ("Samuels Aff."), at ¶¶ 7-9.

Samuels was immediately placed in keeplock status pending a hearing on the misbehavior report. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint ("Motion Brief"), at 3. Under DOCS rules, Samuels was entitled to an employee assistant to assist in his defense of the charges set forth in the misbehavior report.[FN7] An Assistant Selection Form was provided to Samuels, which instructed Samuels to select three people, one of whom would be assigned to him based on availability. *See* Ex. I. Samuels selected Hanna, Lawrence, and Schwartzman as his three choices. *See id.* Instead, Paul Cecilia was assigned to Samuels. *See* Motion Brief, at 3. Samuels alleges that instead of assisting him in the preparation of his case, Cecilia proceeded to interrogate Samuels, asking him if he was in contact with Green Party candidate (formerly "Grandpa Munster") Al Lewis, whether he had any letters from him, whether he had any letters from outside organizations involved in prison reform, whether he was involved in any planned Y2K protest, and what the "Kairos" document was. *See* Complaint, at 8. Samuels further alleges that Cecilia did not explain the charges contained in the misbehavior report and failed adequately to conduct an investigation on Samuels' behalf. [FN8] Cecilia signed an Assistant Form on October 25, 1999, at 12:53 pm, indicating that he had interviewed witnesses, assisted as requested, and reported back to Samuels. *See* Ex. J. However, on October 26, Green Haven officials requested a one-day extension to hold a disciplinary hearing on the basis that the "assistant is trying to speek [sic] to with witiness [sic]." Ex. L. The extension was granted by "Alternate User 999SHURXR for 999SHU." *See id.* The name of the grantor is not listed on the computer printout.

FN7. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1 (2002):(a) An inmate shall have the opportunity to pick an employee from an established list of persons who shall assist the inmate when a misbehavior report has been issued against the inmate if [...] (4) the inmate is confined pending a superintendent's hearing [...].

FN8. Samuels cites a number of failures on Cecilia's behalf: he failed to turn over documentary evidence relating to the charges against Samuels, he failed to provide a written record of the questions he was supposed to ask Samuels' witnesses, he failed to record the testimony of the witnesses interviewed on Samuels' behalf, he failed to explain exactly what material that was confiscated constituted contraband, and he failed to interview the confidential informant to determine his existence or credibility. *See* Complaint, at 9.

**\*4** The "Tier III" disciplinary hearing was held on October 27, 1999. [FN9] At the hearing, two inmates and Dr. George W. Webber testified on Samuels' behalf (Webber testified by telephone). Webber is the director of the Certificate Program and president emeritus of the NYTS. Sgt. Schwartzman testified against Samuels. *See* Ex. O. Samuels also submitted a written brief for the hearing. *See* Ex. M. Samuels was found guilty of "demonstration" and "contraband" on November 9, 1999. The hearing officer, Javier Irurre,[FN10] summarized his findings as follows:

FN9. Tier III hearings are held for "the most serious violations of institutional rules." *Walker v. Bates,* 23 F.3d 652, 654 (2d Cir.1994).

FN10. The name "Javier Irurre" appears on the Hearing Disposition form. *See* Ex. P. Samuels spells the name "Iurrue," *see* Complaint, at 9, while defendants in turn use two spellings for the name-"Iurre" and "Iurrue *See* Motion Brief, at 3. The Court uses the "Irurre" spelling found on the Hearing Disposition form, apparently in Javier Irurre's own handwriting, and on the Tier III assignment form signed by Superintendent Artuz. *See* Appendix 7.

Statement of Evidence Relied Upon: Papers & hand written papers retrieved from your cell show statements inciting revolt and prison unrest. Confidential tape shows similarity between statements in papers you have written and others in your possession with statements found in written material belonging other [sic] inmates inciting the so called Y2K revolt.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Confidential tape and testimony at the hearing establish a link between the statements in papers found in your cell and phamphlets [sic] circulating among prison population urging to strike in Y2K.

Reason for Disposition: Inciting revolt can not be tolerated in a correctional setting.

Ex. P. Samuels was punished with 180 days of keeplock, 180 days of loss of packages, 180 days of loss of commissary privileges, and 180 days of loss of phone privileges. *See* Ex. P; Complaint, at 11. The hearing officer did not impose special housing unit placement. *See* Ex. P; Complaint, at 11. The Court has not been furnished with a transcript of the hearing or of the "confidential tape" referred to by Irurre.

Samuels alleges that his due process rights were violated at the misbehavior hearing. He alleges that he failed to receive a timely hearing, that he received inadequate assistance from the employee assistant assigned to him (Cecilia), and that Dr. Mar Peter-Raoul was not permitted to testify on Samuels' behalf. *See* Complaint, at 9, 11. Samuels also protests the fact that the misbehavior report never specifies exactly what Samuels did to constitute "demonstration." *See id.* at 11. No written record was apparently made stating the reasons Dr. Peter-Raoul was not permitted to testify. Dr. Peter-Raoul later wrote a lengthy letter addressed to defendants Bliden, McCoy, and Irurre in which she explained the nature of the Kairos documents and stated her desire to serve as a witness for Samuels. *See* Complaint, at 10.

On November 8, 1999 (one day before Irurre found Samuels guilty of demonstration and contraband), Samuels submitted a detailed written brief to First Deputy Superintendent Dennis Bliden and "Jeff Macoy" [sic] on November 8, 1999, requesting that his misbehavior report be dismissed. *See* Ex. N. While waiting for a response to his letter, Samuels was transferred to the Upstate Correctional Facility, a special housing unit facility, where he was housed for 180 days.[FN11] *See* Complaint, at 11; Motion Brief, at 4; Plaintiffs' [sic] Memorandum of Law in Opposition to Defendants' Motion ("Opposition Brief"),

at 27. Neither Samuels nor defendants provides an explanation as to why Samuels was transferred to the special housing unit facility. Jeff McKoy (listed in the caption as Jeffery McCoy) wrote to Samuels on November 12, 1999, advising him that he lacked the authority to overturn a Tier III disposition. *See* Ex. R. Bliden wrote to Samuels on November 18, 1999, stating that any appeal Samuels wished to file had to be directed to the Commissioner in Albany. He stated that "[u]ntil such time as we receive a decision from [Albany], I will not modify the disposition." Ex. U.

> [FN11.] Placement in a special housing unit involves confinement for twenty-three hours per day. The inmates assigned to special housing units receive virtually no programming, no congregate activities, and very little natural light. Reading materials are severely restricted, as are visits. *See* Ex. 16, at 5-6 (THE NEW YORK STATE SENATE DEMOCRATIC TASK FORCE ON CRIMINAL JUSTICE REFORM, CRIMINAL JUSTICE REFORM: A TIME THAT'S COME (2001)).

**\*5** As per Deputy Superintendent Bliden's instructions, Samuels submitted a seventeen-page letter to Donald Selsky, the Director of the Inmate Disciplinary Program, in Albany. *See* Ex. V. In the course of his letter to Selsky, Samuels voices his procedurally and substantively-based arguments for dismissing his misbehavior adjudication. Selsky affirmed the November 9, 1999 hearing on January 6, 2000 on behalf of Glenn Goord, the Commissioner.[FN12] *See* Ex. 6. Samuels filed a request for a "time-cut" from the determination of the Superintendent on February 28, 2000. *See* Ex. 6. Prisoners' Legal Services of New York ("PLS") sent a letter to Selsky on March 2, 2000, asking him to reconsider his decision. On April 27, 2000, PLS sent a supplemental request for reconsideration, this time outlining in detail the legal bases for which Samuels' disciplinary charges should be withdrawn (by this point, Samuels had already served the imposed penalty; the letter asks Selsky to reverse the disciplinary hearing and expunge the disciplinary charges). *See* Ex. 9. Selsky did not alter his January 2000 decision. Samuels then appealed to the New York State Supreme Court, apparently by means of an Article 78 proceeding. The court, Canfield J., concluded that Samuels' appeal raised a substantial evidence question that could not be resolved by "reference

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

to the objections in point of law." Decision and Order dated October 13, 2000. The court then transferred the matter to the Appellate Division, Third Judicial Department pursuant to N.Y. C.P.L.R. 7804(g).[FN13] See id.

> FN12. Prisoners' Legal Services of New York cite the date as January 20, 2000. See Ex. 7; Samuels cites the date as January 20, 1999. See Ex. 6.

> FN13. No Appellate Division decision on the matter is in the record. However, defendants' argument on the exhaustion of remedies focuses on administrative remedies and not on this potential deficiency.

Samuels then filed the instant action pursuant to 42 U.S.C. § 1983 based on defendants' alleged violations of his due process, First Amendment, and other constitutional rights, seeking equitable relief as well as compensatory and punitive damages.[FN14] The defendants move to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(1) (lack of subject matter jurisdiction) and (6) (failure to state a claim upon which relief can be granted). For the reasons set forth below, defendants' motion is granted in part and denied in part.

> FN14. In his complaint, Samuels also alleged an Eighth Amendment violation stemming from his treatment during a trip to and from his brother's funeral. This claim was dismissed by order of Judge Mukasey dated September 4, 2001.

III. Legal Standard

A. Pro Se Complaints

The Second Circuit has repeatedly held that pro se complaints must be read more leniently than those prepared by lawyers. Recently, for example, the Second Circuit noted that a "pro se complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff[ ] can prove no set of facts in support of [his]

claim[s] which would entitle [him] to relief." ' Weixel v. Board of Educ. of the City of New York, 287 F.3d 138, 145 (2d Cir.2002) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). Moreover, when considering a motion to dismiss a pro se complaint, "courts must construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." Weixel, 287 F.3d at 146 (quoting Cruz v. Gomez, 202 F.3d 593, 597 (2d Cir.2000) (internal quotation marks omitted)). The Second Circuit has also emphasized that a liberal reading of a pro se complaint is especially important when the complaint alleges civil rights violations. See Weixel, 287 F.3d at 146; Weinstein v. Albright, 261 F.3d 127, 132 (2d Cir.2001). Consequently, Samuels' allegations must be read so as to "raise the strongest arguments that they suggest." Weixel, 287 F.3d at 146 (quoting McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir.1999) (internal quotation marks omitted)).

B. Motions to Dismiss Pursuant to FED. R. CIV. P. 12(b)(1) & (6)

*6 Defendants move to dismiss the complaint pursuant to FED. R. CIV. P.12(b)(1) and (6). The standard of review for dismissal on either basis is identical. See, e.g., Moore v. PaineWebber, Inc., 189 F .3d 165, 169 n. 3 (2d Cir.1999); Jaghory v. New York State Dep't of Educ., 131 F.3d 326, 329 (2d Cir.1997). In either case, a court must assume as true factual allegations in the complaint and construe the complaint in the light most favorable to the plaintiff. See, e.g., York v. Association of Bar of City of New York, 286 F .3d 122, 125 (2d Cir.2002); Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir.1998). While the question of subject matter jurisdiction goes to the power of the court to hear a case, the issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." York, 286 F.3d at 125 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

IV. Legal Analysis

A. Exhaustion of Administrative Remedies

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

1. Legal Standards Governing Exhaustion of
Administrative Remedies

Lawsuits by prisoners are governed by 42 U.S.C. § 1997e,
which holds in part:

No action shall be brought with respect to prison
conditions under section 1983 of this title, or any other
Federal law, by a prisoner confined in any jail, prison, or
other correctional facility until such administrative
remedies as are available are exhausted.

Under this section, where a prisoner brings an action in a
district court before exhausting all available administrative
remedies, the action must be dismissed. A unanimous
Supreme Court has recently interpreted the term "prison
conditions" expansively, requiring an exhaustion of all
available administrative remedies whether the inmate suit
concerns a general prison condition (i.e., quality of food)
or a discrete incident specific to one prisoner (i.e.,
excessive force). See Porter v. Nussle, 122 S.Ct. 983
(2002). The Court also held that the exhaustion
requirement applies regardless of whether the
administrative remedies are "plain," "speedy," or
"effective," and also applies when the prisoner "seeks
relief not available in grievance proceedings" such as
monetary damages. Id. at 988.

As a preliminary matter, defendants concede that Samuels
has exhausted all administrative remedies concerning his
due process violations. See Defendants' Supplemental
Memorandum of Law and Reply Memorandum of Law in
Further Support of Their Motion to Dismiss ("Reply
Brief"), at 9. Defendants' concession is apparently based
on DOCS Directive No. 4040, which holds that:

[T]he individual decisions or dispositions of the following
are not grievable: [...] Media Review, disciplinary
proceedings, inmate property claims (of any amount) and
records review (Freedom of Information Requests,
expunction). However, the policies, rules, and procedures
of any of these programs or procedures may be the subject
of a grievance.

*7 As noted above, Samuels unsuccessfully appealed his
case within the prison facility and later to defendant
Selsky in Albany, who denied it and denied
reconsideration thereof.

Defendants argue, however, that "if a claim is incidental
to a disciplinary determination [...] the fact that the
disciplinary charge itself has been appealed does not
excuse the failure to file a grievance." Reply Brief, at 9.
Defendants thus seek to sever the alleged due process
violations (for which Samuels has exhausted all
administrative remedies) from several closely related
claims-Samuels' claims protesting the confiscation of his
papers, his transfer to the special housing unit, and DOCS
policy regarding the Five Percent Nation of Gods and
Earths (for which defendants argue Samuels has failed to
exhaust all administrative remedies). See Reply Brief, at
9.

2. Confiscation of Documents

Defendants allege that the confiscation of the religious
material is a matter separate from the underlying
disciplinary hearing. While Samuels directly appealed his
disciplinary adjudication, he concedes that he did not
bring any complaint to the inmate grievance program. See
Complaint, at 1. Defendants argue that Samuels' claim
alleging the confiscation of religious material must
therefore be dismissed because he failed to exhaust
administrative remedies. See Reply Brief, at 9-10.
Defendants represent that confiscation of religious
documents from a cell is a grievable matter. The Court
notes, however, that in similar cases inmates have been
told that such confiscations are not grievable. See, e.g.,
Allah v. Annucci, 97 Civ. 607, 1999 U.S. Dist. LEXIS
7171, at *2-*3 (W.D.N.Y. Mar. 25, 1999) (plaintiff filed
an inmate grievance protesting confiscation of religious
material and was told such a seizure was not grievable).

As a preliminary matter, there is considerable confusion
regarding exactly which documents were confiscated.
Samuels has sought these documents numerous times;
defendants have not made the documents available to him
or to the Court. Initially, defendants stated that "Plaintiff
specifically alleges in his compliant that the defendants
confiscated a pamphlet called 'Awake'." Motion Brief, at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

8. Later, defendants state that it is "unclear from plaintiff's complaint and response whether the pamphlet 'Awake' was confiscated from him or another." Yet since defendants conducted the search and confiscation of the materials from Samuels' cell, they should know whether "Awake" was confiscated from Samuels' cell. Nonetheless, they claim ignorance. Samuels himself makes his position clear: "material taken from Plaintiff [sic] cell [...] was not [...] Awake." Complaint, at 2. In a later brief, he writes "Complainant NEVER POSSESSED a pamphlet entitled 'Awake." Opposition Brief, at 3 (emphasis in original).

In any event, it is clear that certain religiously-oriented documents were confiscated from Samuels' cell. Samuels seeks, *inter alia,* punitive and compensatory damages he claims to have suffered through defendants' alleged violation of his rights, including his First Amendment rights. *See* Complaint, at 13. Defendants argue that Samuels "never appealed any grievance relating to the confiscation of religious material" to the Inmate Grievance Program, citing an affidavit of Thomas G. Eagen ("Eagen Aff."), the Director of DOCS's Inmate Grievance Program, dated March 13, 2002. While this may be true, Samuels did protest the confiscation of documents in his direct appeal to Bliden and McKoy and later to Selsky. *See* Exs. N, V, 9. These appeals were denied.

**\*8** As noted, it is factually unclear whether seizures of religious materials may be grieved through the Inmate Grievance Program. However, even if such seizures are grievable, Samuels' alleged failure to exhaust all administrative remedies as required by 42 U.S .C. § 1997e(a) goes only to the narrow issue of the confiscation *qua* confiscation-the damage Samuels suffered from the loss of his property (such as the property value of the books). The main confiscation issue put forward by Samuels is not the confiscation in and of itself, but the confiscation insofar as it was the basis for the misbehavior adjudication.[FN15] This issue was already effectively grieved by Samuels through his direct appeal of his misbehavior determination, which *per se* implicated the confiscation of documents. Defendants argue nonetheless that any confiscation that took place is separate from the disciplinary hearing and thus must be separately grieved. The Court does not agree.

FN15. The real damage suffered by Samuels

was, *inter alia,* his 180 days in keeplock (and later a special housing unit).

Disputes stemming from a disciplinary hearing are properly appealed directly and not through the Inmate Grievance Program. To the extent that the confiscation issue is a constituent element of the misbehavior adjudication, Samuels need not file an administrative grievance because he already sought review of the matter on his direct appeal. The recent case of *Flanagan v. Maly,* 99 Civ. 12336(GEL), 2002 WL 122921 (S.D.N.Y. Jan. 29, 2002), is instructive. In *Flanagan,* the plaintiff brought two separate claims-one stemming from inadequate access to medical and legal resources, and one stemming from an alleged due process violation in a disciplinary hearing. The court found that the plaintiff had not exhausted all administrative remedies with regard to medical and legal access because he failed to utilize the Inmate Grievance Program. With regard to the disciplinary hearing, however, the court held that utilization of the grievance procedures was unnecessary because the plaintiff had already appealed the issues directly:

To require [plaintiff] to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of [ § 1997e(a) ][FN16], by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

FN16. The district court mistakenly cites the provision as " § 1997a(e)," a nonexistent section.

*Flanagan,* 2002 WL 122921, at \*2. While the issue referred to in *Flanagan* was a due process defect in the disciplinary hearing (not at issue here because defendants

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

concede that Samuels exhausted all available administrative remedies), the underlying point, that issues directly tied to the disciplinary hearing which have been directly appealed need not be appealed again collaterally through the Inmate Grievance Program, is applicable to the confiscation issue. Moreover, the confiscation in the instant case is part and parcel of the misbehavior adjudication-unlike the medical claim made in *Flanagan* which was divorced from the due process claim.

**\*9** Defendants rely on a single case in support of their contention that the confiscation issue and the disciplinary hearing issue are wholly separate, *Cherry v. Selsky,* 99 Civ. 4636(HB), 2000 U.S. Dist. LEXIS 9451 (S.D.N.Y. July 7, 2000). It is not completely clear which section of the opinion defendants are citing, because no pinpoint citation is given. In *Cherry,* Judge Baer held that the filing of a false misbehavior report by a corrections officer is a grievable matter. *See id.* at \*21. However, *Cherry* is readily distinguishable from the instant case because in *Cherry,* the plaintiff had "not brought a claim with respect to the due process afforded him at his disciplinary hearing [...]." *Id.* at \*15. In contrast, Samuels makes this claim. As a consequence, the due process violations, including the allegedly wrongful confiscation (to the extent it led to the misbehavior adjudication) may be appealed directly.

Consequently, while Samuels has not exhausted his administrative remedies with regard to the injuries he suffered from the confiscation *alone,* he has exhausted his administrative remedies with regard to the injuries he suffered from the confiscation inasmuch as the confiscation of the religious materials serves as the basis for the disciplinary hearing.[FN17]

> [FN17.] The confiscation of Samuels' documents is not an ancillary issue unrelated to the disciplinary hearing (as was Samuels' Eighth Amendment argument, *see supra* note 14). Instead, the allegedly improper confiscation of materials is part and parcel of the disciplinary proceeding. The primary harm suffered by Samuels of the confiscation was not the value of the documents seized (which is never mentioned by Samuels) but the fact that the confiscation of allegedly harmless materials led to his confinement in keeplock and later in a special

housing unit for 180 days.

3. Special Housing Unit Confinement

Defendants similarly argue that Samuels' claim of retaliatory confinement in a special housing unit is barred because he failed to exhaust all available administrative remedies.[FN18] It is not entirely clear whether Samuels is making an argument based on retaliation. On one hand, he states that "Plaintiff [sic] claim is not on issue of retaliation." Samuels Aff., at ¶ 4. Elsewhere, he argues that "Plaintiff should not need to fear imposition of [special housing unit] confinement because they [sic] have engaged in prison litigation and/or prison reform activity [...]." Opposition Brief, at 25. As noted above, after being sentenced, Samuels was apparently transferred to a special housing unit for 180 days, which involves confinement for twenty-three hours per day.

> [FN18.] There are two separate retaliation issues at play in this action. The first, discussed here, is Samuels' claim of retaliatory confinement in a special housing unit. The second, discussed below, is Samuels' claim that the misbehavior adjudication itself was a form of retaliation for the NYTS's opposition to the Cell Building Project. *See supra* note 5.

Defendants represent to the Court that confinement to a special housing unit is ordinarily grievable. *See* Reply Brief, at 11. Samuels failed to bring this grievance to the Inmate Grievance Program. However, Samuels argues, and defendants do not contest, that Samuels was transferred to the special housing unit as punishment for his misbehavior adjudication, even though he was sentenced to 180 days of keeplock. Consequently, his appeal of his misbehavior adjudication necessarily implicates his sentence-not only his *de jure* punishment of 180 days of keeplock, 180 days' loss of telephone, package, and commissary privileges, but also his *de facto* punishment of 180 days of special housing unit confinement. *See Flanagan,* 2002 WL 122921, at \*2. The transfer to a special housing unit potentially implicates due process concerns. *See, e.g., Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002) (noting that in the Second Circuit, confinement in a special

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

housing unit for more than 101 days generally implicates a liberty interest protected by the Due Process Clause).

4. DOCS Policy Regarding the Five Percent Nation of Gods & Earths

**\*10** Samuels makes an oblique reference to the fact that DOCS has treated members of the Five Percent Nation of Gods and Earths unfairly and partially. *See* Opposition Brief, at 3. To the extent that Samuels has a claim regarding DOCS's treatment of members of the Five Percent Nation, it is not directly tied to his disciplinary hearing and has not been grieved through the Inmate Grievance Program. Moreover, he has not taken issue with DOCS policies regarding the Five Percent Nation in his appeal. Consequently, this issue is dismissed with prejudice.

5. Dismissal of Action

Defendants argue that because Samuels seeks to assert certain unexhausted claims, "the entire action should be dismissed," irrespective of the fact that some claims are (as defendants concede) exhausted. Reply Brief, at 11. Defendants point to no binding precedent in support of this contention. The only New York case cited by defendants is *Radcliffe v. McGinns,* 00 Civ. 4966 (LMM), 2001 U.S. Dist. LEXIS 15528 (S.D.N.Y. Sept. 27, 2001). However, *Radcliffe* does not support defendants assertion that dismissal of some unexhausted claims mandates the dismissal of all claims, because in that case the claims were unexhausted as to *all* defendants. On that basis, the *Radcliffe* court dismissed all claims without prejudice. This Court thus does not find that dismissal of the exhausted claims is warranted.

B. Due Process

1. Samuels Pleads a Valid Due Process Claim

Defendants argue that Samuels does not plead a valid due process claim, claiming that Samuels does not identify a liberty interest, protected by the Due Process Clause, of

which he was deprived. *See* Motion Brief, at 9. Defendants state that "[other] then [sic] allege that he was sentenced to keeplock and transferred to Upstate, plaintiff does not allege any facts that distinguishes [sic] the disciplinary sentence from general prison population conditions." [FN19] *Id.* at 9. Defendants cite *Walker v. Goord,* 98 Civ. 5217(DC), 2000 U.S. Dist. LEXIS 3501, at \*22 (S.D.N.Y. Mar. 22, 2000) for the proposition that a complaint that merely alleges that a plaintiff was housed in a special housing unit does not state a due process claim. *See* Motion Brief, at 10. In fact, *Walker* 's ruling is not so sweeping. In *Walker,* the court held that to establish a liberty interest, a prisoner "must establish that the restraint imposed creates an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Walker,* at \*21 (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). The court also reiterated the Second Circuit's holding that there is no "bright-line rule regarding the length or type of sanction" necessary. *Walker,* at \*21 (citation omitted). The prisoner must also establish that the state has granted its inmates a protected liberty interest in remaining free from that confinement or restraint. *Id.* at \*21.

> FN19. As noted *supra,* Samuels was also sentenced to 180 days' loss of packages, telephone, and commissary privileges.

**\*11** Samuels is able to meet this burden. The deprivation of liberty Samuels suffered was onerous. He was moved from the inmate honor block housing unit to keeplock and then to a special housing unit. *See supra* note 11. Moreover, unlike the plaintiff in *Walker,* Samuels identifies the length of time he was punished (180 days). *See Walker,* at \*22. In light of these facts, and given the length of his confinement, Samuels has met the *Sandin* test cited above. *See Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002). Additionally, the requirement of an appealable hearing, with certain procedural safeguards, *see infra,* indicates that the state has granted inmates a protected liberty interest in remaining free from keeplock and special housing unit placement.

Due process requirements for a prison disciplinary hearing are "in many respects less demanding than those for criminal prosecutions." *Espinal v. Goord,* 180 F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

532, 537 (S.D.N.Y.2002) (quoting *Edwards v. Balisok,* 520 U.S. 641, 647 (1997)). At the same time, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Duamutef v. Hollins,* 297 F.3d 108, 112 (2d Cir.2002) (citation omitted). With respect to Tier III hearings such as the one at issue here, the Fourteenth Amendment requires that:

(1) the inmate receive at least twenty-four hours written notice of the disciplinary charges against him;

(2) the inmate be permitted to call witnesses and present evidence "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals";

(3) the inmate be judged by a fair and impartial hearing officer;

(4) the disciplinary conviction be supported by some evidence; and

(5) the inmate be provided with a written statement of fact findings that support the disposition as well as the reasons for the disciplinary action taken.

*Espinal,* 180 F.Supp.2d at 538 (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-69 (1974)) (internal citations omitted)).

**2. Whether Samuels Received the Process Due Him**

Defendants concede that Samuels was entitled to the aforementioned rights under *Wolff. See* Reply Brief, at 13. They argue, however, that Samuels received all the procedural safeguards due him. Before analyzing defendants points in detail, the Court notes the paucity of the record before it. While Samuels has provided nearly fifty exhibits, defendants have provided only a two-page affidavit by Inmate Grievance Program Director Thomas G. Eagen dated March 13, 2002, attached to which is a nine-line computer printout of what purports to be

Samuels' grievance file. Defendants have failed to submit, *inter alia,* a transcript of the disciplinary hearing, a transcript or audio recording of the confidential witness statements, a written basis for the rejection of Samuels' witnesses, or a copy of the documents that were supposedly seized from Samuels' cell. While the Court is cognizant of the fact that the instant motion is not one for summary judgment, without these and other documents, it is difficult for this Court fully to evaluate the merits of the parties' arguments. More troubling is the fact that this is apparently not the first time an inmate has been sentenced to a special housing unit on the basis of evidence which has not been preserved for judicial review. Indeed, in *Cherry v. Selsky,* 99 Civ. 4636, 2000 U.S. Dist. LEXIS 9451, at *9-*12 (S.D.N.Y. July 7, 2000), a case cited by defendants, the court noted that on more than one occasion, Selsky was forced to reverse his previous decision denying an inmate's appeal because the "record of [the disciplinary] hearing was incomplete and the 'confidential tape' was 'unavailable for judicial review.' " *Id.* at *9 (citation omitted). On the occasion cited by the *Cherry* court, the inmate's record was expunged, but only after the plaintiff had served 125 days in a special housing unit. *See id.* at *9.

**a. Witnesses**

**\*12** Samuels argues that his due process rights were violated because he was not permitted to call Dr. Peter-Raoul as a witness at his disciplinary hearing. *See* Complaint, at 9; Ex. V, at 2. Defendants state, without explanation, that "it is clear that the proffered testimony would have been irrelevant and redundant." Motion Brief, at 13. The Court agrees with defendants that the right of an inmate to call witnesses in his defense is not limitless. Nevertheless, prison authorities' failure to allow an inmate to call a witness may be grounds for reversal, where the authorities fail to justify their actions. *See Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). In this case, Dr. Peter-Raoul was apparently the author of some or all of the "subversive" materials and had close ties to the theological seminary program at the prison. According to Samuels, she also "assisted plaintiff with his course syllabus and provided much of the material utilized" therein. Complaint, at 9. She was therefore in a unique position to explain the appropriateness and relevance of the materials allegedly possessed by Samuels, who had in fact argued that the materials in question were issued to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

him through the NYTS program with the authorization of prison officials. *See, e.g.,* Complaint, at 5, Ex. V, at 2. The misbehavior hearing record sheet states that, "if any witness is denied [the opportunity to testify,] form 2176 explaining the reason for that determination must be given to the inmate and included as part of the record." Ex. O. No such form was filled out, and nowhere in the record do defendants explain or justify their exclusion of Dr. Peter-Raoul. *See* Ex. Q. Due process rights may be violated where prison authorities fail "without rational explanation" to obtain a witness requested by an inmate during a disciplinary hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). Defendants' failure to justify their exclusion of Dr. Peter-Raoul potentially gives rise to a due process violation. [FN20] Dismissal is therefore inappropriate.

> FN20. Samuels also appears to allege that Cecilia, his employee assistant, was not permitted to testify on Samuels' behalf, and that Schwartzman testified outside Samuels' presence. *See* Ex. V, at 4; Plaintiffs' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Stay Complaint, at 8.

b. Confidential Informant

Samuels also protests the fact that he was not furnished with statements of the confidential informant, and argues that the record is insufficient to permit an assessment of the reliability of the informant's testimony. The Second Circuit has noted that "even if due process does require a hearing officer to conduct an independent assessment of the informant's credibility, that 'would not entail more than some examination of indicia relevant to credibility rather than wholesale reliance upon a third party's evaluation of that credibility." ' *Espinal v. Goord,* 180 F.Supp.2d 532, 540 (S.D.N.Y.2002) (quoting *Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1993)). In the instant case, the lack of a full record does not permit the Court to determine whether Irurre, the presiding officer at the Tier III hearing, made the required "examination of indicia relevant to the credibility of the confidential informant[ ], whether by an independent assessment or otherwise." *Espinal,* 180 F.Supp.2d at 540. Consequently, dismissal is inappropriate, because it is uncertain whether Samuels' punishment was supported by constitutionally sufficient evidence.

c. Assistance Provided by the Employee Assistant

**\*13** Samuels claims that his employee assistant, Cecilia, violated his due process rights by, *inter alia,* failing to explain the charges against Samuels, failing to provide Samuels with documentary evidence relating to the charges in the misbehavior report, failing to make a written record of the questions he asked the interviewees, failing to record the testimony of the witnesses he allegedly interviewed for Samuels, failing to interview the confidential informant on Samuels' behalf, and failing to interview one of the three witnesses requested by Samuels. *See* Complaint, at 9; Opposition Brief, at 22. Samuels also complains that his employee assistant did not assist in his defense but instead interrogated him about his alleged links to prison reform activists. *See* Ex. V, at 5-6.

Defendants concede that inmates have a limited right to assistance in misbehavior proceedings. *See Silva v. Casey,* 992 F .2d 20, 22 (2d Cir.1993) (per curiam). While defendants are correct in asserting that inmates do not have the right to appointed or retained counsel at a misbehavior hearing, *see Wolff v. McDonnell,* 418 U.S. 539, 570 (1974), they do have a right to assistance in "certain circumstances [in which they] will be unable to 'marshal evidence and present a defense' [...]." *Silva,* 992 F.2d at 22. Such situations include where the inmate is confined pending a superintendent's hearing. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1(a)(4). The Green Haven Notice of Assistance form given to Samuels specifically states that an "inmate shall have the opportunity to pick an employee from established lists of persons who shall assist the inmate when a Misbehavior Report has been issued against the inmate if [...] [t]he inmate is keeplocked or confined to a special housing unit and is unable to prepare his defense." Ex. J. In the instant case, Samuels was entitled to an employee assistant because he was keeplocked immediately after the search of his cell and was unable to prepare his defense.

As noted, Samuels makes broad assertions as to the deficiency of his employee assistant. *See* Ex. V, at 3-8. Based on Samuels' factual assertions, it is possible that employee assistant Cecilia failed to provide even the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

"limited" assistance to which Samuels is entitled.[FN21] Such a failure potentially implicates Samuels' due process rights. *See Ayers v. Ryan,* 152 F.3d 77, 80-81 (2d Cir.1998). Because the instant motion requires that the Court accept Samuels' allegations as true, dismissal is inappropriate.

> FN21. By statute, the "assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results of his efforts to the inmate. He may assist the inmate in obtaining documentary evidence or written statements which may be necessary. The assistant may be required by the hearing officer to be present at the disciplinary or superintendent's hearing." N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.2. While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation. *See, e.g., Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978).

**d. Actions of the Hearing Officer**

With respect to the hearing officer, Irurre, Samuels makes a variety of claims, including the fact that Irurre prohibited Samuels from calling various witnesses and that he was partial. The Court has not been furnished with a copy of the hearing transcript. Because Samuels' claims potentially implicate constitutional rights, and because any holding on this issue requires that the Court make factual determinations, dismissal is inappropriate.

**e. Timeliness of the Hearing**

*14 Samuels claims that his due process rights were violated because his misbehavior hearing was held eight days after Samuels was confined following the search of his cell. Where an inmate is confined pending a disciplinary hearing (as was the case here), the hearing must be held within seven days of the confinement unless a later date is authorized by the commissioner or his designee. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-5.1(a). In this case, Samuels' rights were not violated.

The search took place on October 20, 1999, and the hearing occurred on October 27, 1999. Under § 251-5.1, the date of the incident is generally excluded. *See, e.g., Harris v. Goord,* 702 N.Y.S.2d 676 (N.Y.App. Div.3d Dep't 2000) (holding that the fourteen-day period in § 251-5.1(b), which runs from the date of the writing of a misbehavior report, is calculated by excluding the day the report is written). Thus, Samuels' hearing was held within seven days of his detention. Moreover, as Samuels admits, prison officials sought and received permission to begin the hearing on October 27, 1999, as per the requirements of § 251-5.1(a). *See* Ex. L. For these reasons, Samuels' claim with regard to the timeliness of his hearing is dismissed.

**f. Notice**

Defendants reject Samuels' argument that he received inadequate notice of the charges against him. It is unclear from the record what notice Samuels received, either before or during the disciplinary hearing. While the Court is cognizant of the fact that inmates are entitled to fewer due process rights than other citizens, it is possible to read Samuels' allegations as presenting a valid due process claim. The Court notes, for instance, that inmate rule 104.12 provides that "[i]nmates shall not lead, organize, participate, or urge other inmates to participate in work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of the facility." N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2(B)(5)(iii). The Appellate Division has held that possession of threatening materials alone does not violate the rule because the inmate must actually lead, organize, participate, or urge other inmates to participate, and not merely intend to do so. *See, e.g., Abdur-Raheem v. Goord,* 665 N.Y.S.2d 152, 153 (N.Y.App. Div. 4th Dep't 1997). While Samuels may have possessed the documents, it is unclear whether he received any notice of how he allegedly led, organized, or participated in (or urged others to participate in) a prohibited activity. Because the determination hinges on a factual determination, dismissal is inappropriate.

**C. Retaliation**

Samuels alleges that his misbehavior adjudication was based on the prison authorities' perception that members

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

of the NYTS were behind the planned Y2K protest. *See* Complaint, at 3-6. Samuels alleges that the materials seized were not subversive and were of a Christian nature. Defendants move to dismiss the retaliation argument, arguing that the prison authorities' decision is entitled to deference. While this may be true, such deference is inappropriate on a motion to dismiss, particularly given the paucity of the record. Without, for example, a transcript of the hearing, a transcript of the testimony of the confidential informant, or a copy of the allegedly subversive documents, the Court cannot blindly defer to the prison authorities. Consequently, dismissal is inappropriate. Defendants also argue that "even if it was improper to discipline plaintiff for possession of contraband, the evidence of plaintiff's involvement in the unauthorized demonstration provided a valid non-retaliatory basis for the disciplinary sanction and transfer." Reply Brief, at 19. This argument is incorrect for two reasons. First, the argument ignores the fact that the contraband documents and testimony of the confidential informant provide the basis for the prison authorities' finding that Samuels was involved in the demonstration. None of these documents is in the record before the Court; thus deference is inappropriate. Second, this argument ignores the fact that Samuels' punishment was ultimately based on the fact that he had violated two rules. His prison file reflects a guilty adjudication on two counts; also, had Samuels been disciplined for violating only one rule, his penalty would likely have been less.

D. Personal Involvement

**\*15** Defendants correctly note that liability of supervisory officials under 42 U.S.C. § 1983 may not be premised on the doctrine of *respondeat superior. See, e.g.,* Poe v. Leonard, 282 F.3d 123, 140 (2d Cir.2002); *Emblen v. Port Auth. of New York/New Jersey,* 00 Civ. 8877(AGS), 2002 WL 498634, at \*10 (S.D.N.Y., Mar. 29, 2002). Consequently, a defendant's personal involvement in the alleged constitutional violation is required. *See, e.g.,* Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690-95 (1978). Such personal involvement may be proven in a number of ways:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995). The Court examines the alleged personal involvement of each defendant in turn.

1. Donald Selsky

Defendants concede Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, was personally involved in the alleged due process violations cited by Samuels. The Court notes that Selsky, acting "on behalf of the commissioner," reviewed and affirmed Samuels' superintendent's hearing and denied Samuels' appeal. Ex. 6, V.

2. Glenn Goord

Defendants argue that Glenn Goord, DOCS Commissioner, has no personal involvement in this case, and that the only link to him in this action is a newspaper article. *See* Reply Brief, at 20-21. This is incorrect, however, since the denial of Samuels' appeal was written by Selsky on behalf of Goord. As noted, defendants concede Selsky's involvement. Goord had a duty to supervise his subordinate who purportedly acted in his name.[FN22] Without further evidence, the Court cannot say as a matter of law that Goord was not personally involved, since personal involvement can include gross negligence "in supervising subordinates who committed the wrongful acts." *Colon,* 58 F.3d at 873.

FN22. Whereas the doctrine of *respondeat superior* involves the legal assignment of liability to a supervisor for the acts of a subordinate, the instant case involves a subordinate who claims to be (and legally is) acting in the name of his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

supervisor.

3. Paul Cecilia

Defendants concede Paul Cecilia's personal involvement.

4. Javier Irurre

Defendants concede Javier Irurre's personal involvement.

5. Sergeant Schwartzman

Defendants concede Sergeant Schwartzman's personal involvement.

6. Dennis Bliden

Defendants allege that Samuels never argues that Bliden had the ability to remedy the alleged constitutional violation. However, Bliden wrote to Samuels in response to his appeal of the misbehavior adjudication, stating, "You may appeal this hearing to the Commissioner in Albany. Until such time as we receive a decision from this office, *I will not modify the disposition.*" Ex. U (emphasis added). Significantly, Bliden did not state that he *could* not modify the disposition but stated that he *would* not. This provides at least *prima facie* evidence that Bliden had the authority to overturn the disposition. While further facts may reveal this to be untrue, at this stage dismissal is inappropriate.

7. Jeffery McKoy

**\*16** Samuels fails to provide any support for McKoy's personal involvement in this action. Indeed, in responding to one of Samuels' appeals, McKoy wrote that "I do not have the authority to overturn Tier 3 dispositions." Ex. R. McKoy does not appear to have been complicit in any alleged deprivation of Samuels' rights, and, in contrast to Bliden, he plainly lacked the authority to overturn the

misbehavior adjudication. Consequently McKoy was not personally involved in the matter and all claims against him are dismissed.

8. Christopher P. Artuz

Christopher P. Artuz is Green Haven's Superintendent. Samuels states that his involvement stems from his failure to respond to a note sent to him. Although the note to Artuz does not appear to be in the record before the Court, it is referenced in a note from Bliden to Samuels. *See* Ex. T ("This is in response to your memo of November 12, 1999 to Superintendent Artuz"). Samuels also alleges that Artuz failed to respond when contacted by Dr. Peter-Raoul and Dr. Webber, who sought to intervene on Samuels' behalf. *See* Opposition Brief, at 27. While it is not clear that Artuz was personally involved, the question of Artuz's involvement in this matter is a factual question. In such cases, dismissal should be denied. As the Second Circuit noted in *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986), "even if [the prison superintendent] did not actively affirm the conviction on administrative appeal, we cannot say, on this record, that as Superintendent [of the prison] he was not directly responsible for the conduct of prison disciplinary hearings [...]."

E. Qualified Immunity

Defendants move to dismiss this action based on the qualified immunity of defendants. As defendants correctly point out, government employees are generally immune from liability for civil damages "when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Duamutef v. Hollins,* 297 F.3d 108, 111 (2d Cir.2002) (citation omitted). As a preliminary matter, it should be noted that qualified immunity is only a defense to claims for money damages and are not a defense for equitable relief or injunctions. *See, e.g., Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000). To the extent that Samuels seeks equitable relief, defendants' potential claims of qualified immunity are no bar.

The Court is unable to determine at this time whether the remaining defendants are entitled to qualified immunity in

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

this case. The reason is that without having basic
documentary evidence, including a transcript of the
disciplinary hearing, a transcript of the testimony of the
confidential informant, and the documents allegedly seized
from Samuels' cell, the Court cannot determine whether
these defendants violated Samuels' clearly established
constitutional or statutory rights. Because it is a
fact-intensive question, it cannot be disposed of at this
stage.

V. Conclusion

**\*17** For the reasons set forth above, defendants' motion to
dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1)
and (6) is DENIED with respect to defendants Selsky,
Goord, Cecilia, Irurre, Schwartzman, Bliden, and Artuz.
Defendants' motion is GRANTED with respect to Jeffery
McKoy, and with respect to the issue of DOCS policy
regarding the Five Percent Nation of Gods and Earths and
with regard to the timeliness of Samuels' misbehavior
hearing.

SO ORDERED.

S.D.N.Y.,2002.
Samuels v. Selsky
Not Reported in F.Supp.2d, 2002 WL 31040370
(S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2005 WL 2482493
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

BMS ENTERTAINMENT/HEAT MUSIC
LLC, Aldeen Wilson, Theodore Green
Rahmid Brown, Ronique Thomas Plaintiffs,
v.

Christopher BRIDGES, Kanye West, EMI
April Music, Inc., a Connecticut Corporation,
Ludacris Music, Universal Music Group,
a Corporation, Universal Music and Video
Distribution Corp., a California Corporation,
and John Doe Defendants 1-100 Defendants.

No. 04 Civ. 2584(PKC).
|
Oct. 7, 2005.

Opinion

*MEMORANDUM AND ORDER
ON MOTION TO PRECLUDE*

CASTEL, J.

**\*1** This action was commenced on April 5, 2004. On June 4, at an initial pretrial conference, I entered a Case Management Plan and Scheduling Order bifurcating discovery on liability and damages. I ordered that all liability fact depositions be completed by September 30, 2004. I also ordered that plaintiffs' expert report be produced by August 15, 2006 and all liability expert discovery be completed by October 30, 2004. *See* Order of June 4, 2004.

By stipulation, entered as an order on October 25, defendants were given until October 29 to file their expert report and plaintiffs were given until November 12 to file a rebuttal report. Thereafter, at plaintiffs' request, I extended the date for expert discovery until December 10, 2004. *See* Order of November 12, 2004.

On November 23, 2004 I directed that the deposition of plaintiffs' expert be conducted on December 7 at 10:00 a.m., and if that deposition did not go forward then, the report of the expert, Ms. Judith Finell, would be stricken. I

directed that, "[t]he underlying documents used to prepare the rebuttal report will be provided to defense counsel." *See* transcript and minute entry of November 23, 2004.

On December 20, I ordered a continuation of Ms. Finell's deposition for January 7, 2005 because all documents had not been produced. I ordered that, "plaintiffs will produce to defendants on or before December 17, 2004, all notes, drafts, correspondence, transcriptions, and all other materials referred to or relied upon by Judith Finell in preparing her expert reports." *See* Docket Entry 32, December 20, 2004.

At a March 2, 2005 conference, plaintiffs' counsel was pressed on whether plaintiffs had produced all of the ordered expert documents and, specifically, whether the expert or the expert's assistant, Ms. Csizmadia, had any unproduced documents. Plaintiffs' counsel represented at the conference that he had made due inquiry and had been advised by the expert that neither the expert nor the expert's assistant had any additional documents. To avoid future disputes on the subject, I directed plaintiffs' counsel to put the representation in writing by March 4. He voiced no objection to this direction and did not claim an inability to comply. I also ordered plaintiffs to produce Ms. Csizmadia for a deposition no later than March 31, 2005. I further directed that, if Ms. Csizmadia was out of the country as plaintiffs' counsel was concerned she might be, then a declaration from her and a copy of her stamped passport establishing her absence form the country should be submitted.

When plaintiffs' counsel's failed to provide the representation by March 4 and this circumstance was brought to my attention, I ordered as follows: "I am greatly troubled by the assertion of non-compliance with my direction of March 2, 2005. Mr. Savoy [plaintiffs' counsel] is ordered to file with the Court by 5 p.m. March 21 an affidavit attesting that he has made due inquiry of Ms. Finell and her assistant as to whether any additional expert documents exist (as defined by the discovery requests served in this case) and they have confirmed that there are not any such documents. Of course, if any exist, they are to be produced by 5 p.m. March 21." *See* Order of March 16, 2005.

**\*2** When it appeared that there had been no compliance with the March 16 Order, I issued an Order dated March 22, 2005 warning of the consequences of further non-

2005 WL 2482493

compliance: "The expert rebuttal report of Ms. Finell will be stricken if by March 28, 2005 at 10 a.m. plaintiff has not filed with the Court affidavits from Ms. Finell and her assistant, Ms. Csizmadia, attesting to the fact that all documents ordered to be produced have been produced." I further ordered that "The deposition of Ms. Finell's assistant, Ms. Csizmadia, will go forward as ordered for March 31, 2005."

No affidavit from Ms. Finell or Ms. Csizmadia was filed with this Court by March 28 and Ms. Csizmadia was not produced for her deposition on March 31. Plaintiffs' counsel sent a letter to Chambers enclosing an e-mail exchange with Ms. Finell. Plaintiffs' counsel also submitted his own undated "Affidavit" asserting, among other things, that "Mrs. Finell is currently in Los Angeles, CA working on another case and cannot assist in locating Ms. Csizmadia until she returns in approximately two weeks. [1]

By Notice of Motion filed April 5, defendants moved under Rule 37(b) and (c) to preclude the plaintiffs from introducing expert reports and testimony from Ms. Finell and for other relief.

On April 7, 2005, I conducted a hearing on the record and plaintiffs' counsel acknowledged that plaintiffs had not complied with my Order of March 22. He endeavored to lay blame at the feet of defendants on the attenuated theory that non-compliance was due to defendants' non-payment of plaintiffs' expert's fees arising out of a prior deposition session. At the April 7 hearing, I directed the defendants to pay the sum, even though it provided no excuse for plaintiffs' failure to comply with my March 22 Order. On April 8, defendants' counsel sent plaintiffs' counsel the sum of $6,709.59 to cover the plaintiffs' expert's expenses.

On April 7, I set April 15 as the date for plaintiffs' response to the motion to preclude. On April 15, at plaintiffs' request, I extended the date for filing of plaintiffs' answering papers to April 18. On April 18-a date exceeding the two weeks that Ms. Finell would be in Los Angles on another case and ten days after payment had been made by defendants-I received a Memorandum of Law from plaintiffs. No affidavit or declaration from Ms. Finell or Ms. Csizmadia was submitted as part of plaintiffs' answering papers. Plaintiffs' did annex to the Memorandum of Law a series of emails from Ms. Finell,

one of which confirms her awareness of my March 22 Order. On April 19, plaintiffs' counsel faxed to Chambers a copy of a letter he had sent to defendants' counsel enclosing a, "To whom it may concern" note from Ms. Csizmadia claiming that she had "turned over the documents involving the work to Ms. Finell"; illegible pages from her passport were also enclosed.

It is now nearly six months after the filing of plaintiffs' answering papers and, despite the pendency of the motion to preclude, plaintiffs have neither filed nor sought leave to file an affidavit or declaration from Ms. Finell or Ms. Csizmadia. Ms. Csizmadia has not been produced for her deposition.

**\*3** I have reviewed the excerpts from the January 7, 2005 deposition of Ms. Finell and I conclude that the emails and draft reports that were once in the possession of Ms. Csizmadia would likely be material to defendants' ability to respond to Ms. Finell's trial testimony. Various suggestions from counsel that neither Ms. Finell nor Ms. Csizmadia has any documents responsive to defendants' requests are not a substitute for a deposition of Ms. Csizmadia or an affidavit or declaration from Ms. Csizmadia or Ms. Finell explaining why such a deposition cannot be taken. I have no basis to conclude that all ordered materials have been produced. Indeed, an email from Ms. Finell to both plaintiffs' counsel and defendants' counsel dated April 7 suggests otherwise: "I will send you the documents you have requested just as soon as I receive the check and it clears." (Exhibit OO to Reply Affidavit of Justin N. Kattan.)

Preclusion of a party's expert witness is a remedy not to be imposed lightly. In determining whether to grant preclusion, a district court should consider: "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the testimony; and (4) the possibility of a continuance." *Softel, Inc. v. Dragon Med. and Scientific Communications, Inc.,* 118 F.3d 955, 961 (2d Cir.1997), *cert. denied,* 523 U.S. 1020 (1998); *see also Outley v. City of New York,* 837 F.2d 587, 590-91 (2d Cir.1988). Here, the proffered reasons for non-compliance-Ms. Finell's engagement with matters on the west coast and the non-payment of her bill-have long since ended and, yet, there still has been no compliance. I acknowledge that Ms. Finell's

Case 9:13-cv-01577-LEK-DEP   Document 153   Filed 03/05/18   Page 87 of 87
BMS Entertainment/Heat Music LLC v. Bridges, Not Reported in F.Supp.2d (2005)
2005 WL 2482493

testimony is important to plaintiffs and was cited in my opinion denying summary judgment; yet, on issues of similarity, the trier of fact will have the accused composition and the plaintiffs' copyrighted work-a hip hop composition-and can assess similarity. Defendants challenge the originality of the similar elements, alone or in combination with each other, and the subject matter is such that the trier of fact will be able to make its own assessment. Because of plaintiffs' on-going failure to produce, the contours of the prejudice resulting from the non-production of documents in the possession of plaintiffs' expert cannot be gauged with precision. At a minimum, the prejudice that would result to defendants if I were to allow the Finell reports and testimony to stand is that defendants would not have the benefit of the underlying notes, communications and analysis which may be critical for cross-examination. Merely striking a rebuttal report and allowing Ms. Finell to otherwise testify would deprive defendants of potentially important fodder for cross-examination. Finally, this is not a case where a continuance would have mattered. Six months have passed since the motion to preclude and plaintiffs have not sought to cure the deficiencies. I have no reason to believe that six more months would make a difference. Ms. Finell's testimony will be precluded.

**\*4** Defendants also move for the award of the expenses and attorneys' fees caused by plaintiffs' failure to comply

with my Orders. Rule 37(b)(2) provides that "[i]n lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust". Plaintiffs' counsel has not shown that the failure to comply was "substantively justified" or that it would be "unjust" to make an award. I will award the defendants reasonable expenses, including attorneys' fees, caused by the plaintiffs' failure to comply.

*Conclusion*
Defendants' motion to preclude is GRANTED to the extent that (1) the testimony of Judith Finell is precluded, and (2) attorneys' fees and expenses caused by the failure to comply with the prior Orders of this Court are awarded. Defendants' fee application may be submitted at the conclusion of the case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 2482493

Footnotes

1    The "Affidavit" was not notarized but "certif[ied]" that "each of the statements contained herein is true to the best of my information and belief." It also recited an understanding that a "willfully false" statement is subject to the penalties for perjury. I will take the undated "Affidavit" as a declaration under 28 U.S.C. § 1746.